# United States Court of Appeals
## For the First Circuit

No. 00-1670

UNITED STATES OF AMERICA,

Appellee,

v.

DEREK CAPOZZI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Torruella, Circuit Judge,

Stapleton,* Senior Circuit Judge,

and Howard, Circuit Judge.

Patricia A. Garrity, with whom Joseph C. Laws, Jr., Federal Public Defender, was on brief for appellant.
Steven L. Lane, United States Department of Justice, with whom Michael J. Sullivan, United States Attorney, and Christopher F. Bator, Assistant United States Attorney, were on brief, for appellee.

October 6, 2003

_____
*Of the Third Circuit, sitting by designation.

**HOWARD**, **Circuit Judge**. This case arises from defendant Derek Capozzi's unlawful attempt to force a used car dealer to refund the purchase price of a truck with which he was dissatisfied. After a ten-day trial, a jury convicted Capozzi of being a felon in possession of a firearm, see 18 U.S.C. § 922(g)(1), attempted extortion affecting interstate commerce, see 18 U.S.C. § 1951(a) (the "Hobbs Act"), and use of a firearm during the attempted extortion, see 18 U.S.C. § 924(c). Capozzi challenges his convictions on several grounds. We affirm.

## I.

We set forth the facts underlying Capozzi's convictions in the light most favorable to the verdict. See United States v. Diaz, 300 F.3d 66, 69 (1st Cir. 2002). In January 1998, Capozzi purchased a used Chevy Blazer ("truck") for $4,500 from Gardner Park Auto Sales ("Gardner Park") in Peabody, Massachusetts. Capozzi quickly came to believe that the truck was a lemon. On the evening of February 17, 1998, Capozzi and his friend, Jason Stone, left the truck at Gardner Park with a note telling Michael McGrath, the owner of the dealership, that Capozzi wanted his money returned. At the time, Capozzi was living approximately three hundred yards from Gardner Park in Room #2 at the Charles Hotel with his girlfriend, Erica Murphy. Stone and his companion, Santina Luca, were staying with Capozzi and his girlfriend.

-2-

The next afternoon Capozzi and Stone, both armed, returned to see McGrath. Capozzi, who was a convicted felon, carried a revolver that he had purchased from Stone several months earlier. Stone carried a knife that appeared to be a gun because the handle looked like the butt of a revolver. After entering McGrath's office, Stone waited by the door while Capozzi demanded a refund of his money. McGrath refused because Capozzi had put a large dent in the truck. Capozzi tried to bargain, telling McGrath that he would accept $4,000 instead of $4,500. When McGrath again refused, Capozzi unzipped his coat and showed McGrath the gun that was tucked into his pants. McGrath still refused to return Capozzi's money. Angered, Capozzi placed the barrel of the gun to McGrath's head and screamed, "I'll f---- kill you if you don't give me my money."

As the dispute turned violent, a business associate of McGrath's, Carlo Fahkri, and his brother, John Fahkri, happened to arrive at Gardner Park to see McGrath. They entered McGrath's office and tried to defuse the situation. As the Fahkris attempted to mediate, a telephone rang in another part of the building. McGrath told Capozzi that he needed to answer the call and bolted from the room. After escaping, McGrath called the police. Stone, suspecting that McGrath would call the police, took the gun from Capozzi and returned to the Charles Hotel, where he hid Capozzi's gun and his knife. Shortly, the Peabody police arrived at Gardner

Park and arrested Capozzi. Several minutes later, another officer located Stone walking from the Charles Hotel toward Gardner Park and arrested him. Because Stone's knife appeared to be a gun, the witnesses on the scene incorrectly told the police that both Stone and Capozzi were carrying guns.

At the time of the Gardner Park incident, authorities were investigating whether Capozzi was involved in a bank robbery in Beverly, Massachusetts. In due course, a federal grand jury returned a five count indictment against Capozzi. The first three counts (identified in the introduction) related to the attempted extortion at Gardner Park; the other two involved the alleged bank robbery. The district court severed the counts relating to the attempted extortion and, following the denial of Capozzi's suppression motion (which we discuss in greater detail infra), the case proceeded to trial. As set forth above, a jury convicted Capozzi of all three counts.

**II.**

Capozzi appeals his convictions alleging three errors. He first challenges the district court's refusal to suppress evidence of the gun used in the attempted extortion, arguing that the search warrant under which the police seized the gun was obtained without probable cause and in bad faith. Capozzi next contends that the Hobbs Act count should have been dismissed because application of the Act to Capozzi's conduct exceeds

-4-

Congress' Commerce Clause authority. Finally, Capozzi argues that even if the government could have proceeded with the Hobbs Act prosecution, the district court nevertheless should have dismissed the Hobbs Act count because the government failed to establish that Capozzi's conduct interfered with interstate commerce.

### A.    **The Suppression Ruling**.

The district court agreed with Capozzi that the search warrant which led to the discovery of the gun used in the extortion attempt was issued without probable cause. Nonetheless, the court declined to suppress the evidence of the gun, relying on "the good faith exception" established in United States v. Leon, 468 U.S. 897 (1984). Capozzi contends the district court's Leon ruling was erroneous. Applying de novo review (but accepting the district court's factual findings absent a demonstration of clear error), see United States v. Owens, 167 F.3d 739, 743 (1st Cir. 1999), we disagree.

We begin our explanation with a recitation of necessary background. Immediately after the Peabody police arrested Capozzi and Stone, the officers on the scene shared information with each other about the crime. One officer told his colleagues that he recently had responded to an emergency call from Capozzi's room at the Charles Hotel. Based on this information, the police obtained Capozzi's consent to search his room while he remained in custody. With Erica Murphy and Santina Luca present, several Peabody

-5-

officers searched the room for more than an hour but could not find any weapons.[1]

The next day, February 19, 1998, Capozzi and Stone were arraigned in the Peabody District Court. Murphy and Luca were among those present at the arraignment. Later that day, while walking his beat, Peabody Officer Daniel Murphy, who had been involved in the searches of Capozzi's hotel room, saw Erica Murphy and Santina Luca on the street near the Peabody District Court. Officer Murphy recognized the women from the previous day and asked them if Capozzi had made bail. One woman replied that they had just come from the court and that Capozzi's bail had been set at $50,000; the other stated that the next court date was set for February 23, 1998.

That same afternoon, Sergeant Thomas Griffin of the Salem Police Department received a telephone call from an informant. The informant told Griffin that she had previously provided tips to another Salem detective and that she had new information to report. She reported that she had been present at the Peabody District Court that morning where she overheard two women discussing a gun and a knife hidden in a hotel room in Peabody. The informant overheard the women say that the police had been unable to find the

---

[1] Immediately prior to obtaining Capozzi's consent, the officers conducted an initial unsuccessful search of the room with only Murphy's permission. Shortly after that search began, Murphy told the officers that it was not her room and therefore instructed them to leave.

weapons because they were wrapped in a sock.  The informant specified that the gun and knife were used in an assault on a Peabody businessman.  The informant remained anonymous.

After receiving this tip, Griffin called the Peabody police to report the tip, but they took no immediate action. Griffin also told Salem Detective Harry Rocheville about the information he had received.  Rocheville, in turn, relayed the tip to F.B.I. Special Agent Gerald Mohan, who was investigating Capozzi's possible involvement in the Beverly bank robbery.

While traveling to work on February 19, 1998, Massachusetts State Police Trooper Robert Irwin learned from the media that Capozzi and Stone had been arrested for the Gardner Park incident.  Capozzi was a suspect in two of Irwin's ongoing investigations.  Later that day, Irwin contacted Peabody Detective Richard Robillard, who had been involved in investigating the Gardner Park incident, to learn more about the attempted extortion. Robillard told Irwin that Capozzi was suspected of having a gun, but that searches of the Charles Hotel, Gardner Park, and the surrounding area had failed to uncover it.

Irwin offered Robillard the services of the State Police Dive Team for the next day to search a waterway located behind Gardner Park.  The dive team's search did not locate any weapons. Officer Murphy was among those present at the dive search; he told Irwin about his encounter the day before with Erica Murphy and

Santina Luca. F.B.I. Agent Mohan was also present at the dive search; he told Irwin that he had learned from Rocheville about the anonymous tip in which two women at Capozzi's arraignment stated that the gun used in the crime was hidden in a hotel room in Peabody.

After the dive search, Irwin began to prepare a search warrant affidavit based on the information that he had collected. Before completing the affidavit, Irwin called Rocheville at the Salem Police Department to learn more about the anonymous tip. Rocheville described the substance of the informant's telephone call.

Irwin prepared an affidavit to obtain a search warrant for Capozzi's room at the Charles Hotel. The Irwin affidavit described the crime and the unsuccessful search to which Capozzi consented. It also described the fruitless searches of the areas surrounding Gardner Park. Further, it reported the substance of the informant's anonymous tip to the Salem Police and Officer Murphy's conversation with Erica Murphy and Santina Luca in which they told him that they were present at the Peabody District Court for Capozzi's hearing. Finally, it stated that the door of Capozzi's hotel room was locked on February 20th. As a result of this information, Irwin offered his opinion that there was probable cause to believe that the weapons used by Capozzi and Stone in the attempted extortion were located in Room #2 at the Charles Hotel.

After drafting the affidavit, Irwin contacted Essex County Assistant District Attorney Robert Bender, an experienced appellate attorney. Irwin asked Bender if, based on the information he had gathered, there was a basis for searching the room. Bender told him that he had developed enough information to conduct a search and should apply for a warrant. Irwin submitted the affidavit and a warrant application to the Clerk Magistrate of the Peabody District Court (the "magistrate"). The magistrate issued the warrant.

Irwin, along with representatives of the Peabody Police, conducted the search. The officers first found a knife inside a Kleenex box and then found a revolver that matched the description of the gun that Capozzi had used in the crime. The gun was found inside the lining of a chair wrapped in a pair of boxer shorts.

Capozzi moved to suppress evidence of the gun, arguing that the Irwin affidavit was insufficient to establish probable cause for a warrant because it was based primarily on information provided by an uncorroborated, anonymous informant. He also argued that the Leon good faith exception did not apply because Irwin intentionally or recklessly misstated material information in the affidavit, and the affidavit was so lacking in the indicia of probable cause that an objective officer would not reasonably rely on it to obtain a warrant. After an evidentiary hearing, the district court denied Capozzi's motion to suppress. The court

agreed that Irwin's affidavit failed to establish probable cause for the search because the police had insufficient corroboration of the reliability of the anonymous tip.  However, the court concluded that the good faith exception applied because "given all the circumstances under which he sought the warrant, Trooper Irwin's action and his reliance on the warrant's validity were objectively reasonable."

Because we regard the district court's Leon ruling as sound but its probable cause ruling as more controversial, we proceed directly to the district court's ruling that evidence of the gun was admissible because Irwin obtained the warrant in good faith.  See Leon, 468 U.S. at 925 (holding that courts have discretion to proceed directly to the good faith issue without first addressing probable cause issue); Owens, 167 F.3d at 744-45 (same).  In Leon, 468 U.S. at 922, the Supreme Court adopted an exception to the usual rule that evidence seized in violation of the Fourth Amendment must be excluded from trial.  The Court recognized that the purpose of this exclusionary rule is to deter police misconduct; therefore, it declined to apply the rule in circumstances where an officer acts in good faith to obtain a warrant because suppression in such instances does not "logically contribute to the deterrence of Fourth Amendment violations."  Id. at 921.

Yet, while <u>Leon</u> restricts the application of the exclusionary rule, it does not eliminate it. <u>See</u> <u>United States</u> v. <u>Ricciardelli</u>, 998 F.2d 8, 15 (1st Cir. 1993). Exclusion remains the appropriate remedy in several circumstances, including (1) where the magistrate is misled by information in an affidavit that the affiant knew was false or would have known was false except for a reckless disregard for the truth, or (2) where the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. <u>See</u> <u>United States</u> v. <u>Brunette</u>, 256 F.3d 14, 19 (1st Cir. 2001) (citing <u>Leon</u>, 468 U.S. at 923). Capozzi claims that both of these situations are present here. We disagree.

## 1.    **False Information**.

Capozzi identifies four pieces of information that he claims Irwin intentionally or recklessly omitted from or misstated in the affidavit: (1) the affidavit omitted that the informant claimed to have previously provided other tips to the Salem Police Department; (2) the affidavit misstated that the informant told the officer that a gun (rather than a gun and a knife) were in the room; (3) the affidavit misstated that the informant reported that the gun "is" hidden (rather than "was" hidden) in the hotel room; and (4) the affidavit misstated the point in time when the police locked Capozzi's hotel room door.

In its findings of fact after the evidentiary hearing, the district court found that Irwin had prepared his affidavit by collecting information from several officers under significant time pressure and in an "unfamiliar search scenario." It found no evidence that Irwin had acted intentionally or recklessly in making any misstatements or omissions. These findings are not clearly erroneous. At most, Irwin's omissions and misstatements reflect negligence, mistake, or inattention to detail as he rushed to prepare an affidavit in the midst of a developing investigation. Mere negligence or inattention to detail in preparing an affidavit does not deprive the government of the benefits of the Leon exception. See Brunette, 256 F.3d at 20; Owens, 167 F.3d at 745.

Moreover, the omissions and mistakes identified by Capozzi were not material to the magistrate's decision to issue a warrant. See Owens, 167 F.3d at 745. Irwin's omission of the fact that the informant stated that she had provided prior tips to the police was an immaterial, indeed perhaps even a cautiously appropriate, omission from the affidavit. Irwin had no information to support the informant's claim of providing previous tips. If such information had been included in the affidavit, it may have influenced the magistrate to accord the informant unwarranted credibility. See United States v. Jordan, 999 F.2d 11, 14 (1st Cir. 1993)(noting that proof that confidential informant had

-12-

provided past reliable information may be sufficient by itself to establish reliability of informant's statement).

Irwin's omission of the informant's statement that a knife would also be found in the hotel room was also immaterial. The focus of the police's investigation had been on the search for two guns, and Irwin's inclusion of the fact that a knife might also be found in the room would not have changed the magistrate's evaluation of the possibility that a gun might be present. In any event, while it might have been preferable for Irwin to have transcribed the tip exactly as he received it, any error can only be regarded as an innocent mistake made under significant time pressure. See p. 12 above.

The alleged misstatement concerning verb tense is a criticism of the form rather than the substance of Irwin's affidavit. Such technical criticism of the form of the affidavit is insufficient to undermine its veracity. See Illinois v. Gates, 462 U.S. 213, 235 (1983) ("affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation") (internal quotations omitted). Finally, the statement referring to the locked hotel room door was not a misstatement at all. The affidavit did not say, as Capozzi suggests, that the door was locked immediately after Capozzi's arrest. Rather, it stated accurately that the door was locked by the police on February 20, 1998.

## 2. Probable Cause.

Capozzi's other assertion is that the good faith exception does not apply because, even though the magistrate issued the warrant, an objectively reasonable officer would have realized that the affidavit failed to establish probable cause. In support of this assertion, Capozzi relies heavily on the fact that Irwin's affidavit was partially informed by a hearsay tip from an anonymous source.

Reliance on anonymous tips is "commonplace" and "a necessary part of police work." United States v. Schaefer, 87 F.3d 562, 566 (1st Cir. 1996). Even when based on hearsay, such tips are often "the stuff of search warrant affidavits." Jordan, 999 F.2d at 13-14. Nevertheless, for such a tip to serve as the predicate for probable cause, the officer must attempt to corroborate the informant's story under the totality of the circumstances. See Gates, 462 U.S. at 238. The officer, need not, however, entirely eliminate "the risk that an informant is lying or in error." United States v. Barnard, 299 F.3d 90, 94 (1st Cir. 2002)(quoting United States v. Khounsavanh, 113 F.3d 279, 284 (1st Cir. 1997)). Thus, to qualify for the good faith exception, Irwin must have provided sufficient corroboration of the informant's tip that an objectively reasonable officer would have relied on the tip to apply for a warrant. See Malley v. Briggs, 475 U.S. 335, 345 (1986).

-14-

Several kinds of information can corroborate an informant's anonymous tip: whether the affidavit supports the basis of knowledge of the person providing the hearsay; whether the informant's statements were self-authenticating; whether some of the informant's statements were corroborated; and whether a law enforcement professional included an assessment of the significance of the facts relayed by the informant to the investigation. See Barnard, 299 F.3d at 93. "None of these factors is indispensable"; the ultimate issue is whether the totality of the circumstances establishes the credibility of the informant's story. United States v. Zaya-Diaz, 95 F.3d 105, 111 (1st Cir. 1996).

Here, Trooper Irwin presented sufficient information for an objectively reasonable officer to believe that the anonymous tip had been adequately corroborated. Irwin learned from Officer Murphy that the two women who were present at the initial search of Capozzi's room at the Charles Hotel were also present at the Peabody District Court for Capozzi's arraignment. Thus, Irwin confirmed that individuals with first-hand knowledge concerning the whereabouts of the weapons used in the crime were present at the location where the informant stated that she had gathered her information. In addition, the informant stated that a failed police search had already been conducted on the hotel room. This information about the prior, unsuccessful search was accurate and not publicly available.

-15-

The informant's tip was also consistent with information available to the police from other sources. The police had substantial evidence from the initial crime scene investigation that Stone had taken his and Capozzi's weapons and hidden them in the hotel room. The police also knew that neither Stone nor Capozzi could have retrieved the weapons because they were in custody. See Barnard, 299 F.3d at 95 (noting that police investigation which is consistent with a tip provides corroboration). Considering this corroboration, it was objectively reasonable for Irwin to rely on the informant's tip to apply for a warrant to search Capozzi's room at the Charles Hotel.

Irwin's other conduct also supports his good faith in seeking the warrant. See Ricciardelli, 998 F.2d at 15 (court examines "all the attendant circumstances" in determining whether officer acted in objective good faith in believing that there was probable cause). Irwin's was not a "bare bones affidavit" which provided the magistrate with only the suspicions and conclusions of the officer and no underlying information. See United States v. Weaver, 99 F.3d 1372, 1378 (6th Cir. 1996). Irwin summarized in detail virtually all of the information available to him, including the investigation of the crime, the failed searches, the conversation between Officer Murphy and Erica Murphy and Santina Luca, and the substance of the anonymous tip. See United States v. Diehl, 276 F.3d 32, 43 (1st Cir. 2002) (concluding that affidavit

-16-

which was not "bare bone" supported good faith conclusion).  Also, before presenting the affidavit to the magistrate for approval, Irwin sought a legal opinion from Assistant District Attorney Bender that probable cause existed to search the hotel room.  See United States v. Tuter, 240 F.3d 1292, 1299-1300 (8th Cir. 2001) (suggesting that contacting attorney for advice on the existence of probable cause before seeking warrant evidences good faith).

In sum, the record shows that Irwin did not intentionally or recklessly mislead the magistrate by filing a false affidavit, and that he presented sufficient information for an objective officer to believe that there was probable cause to search Capozzi's hotel room.  Accordingly, the district court correctly admitted the gun pursuant to the Leon good faith exception.

**B.      The Hobbs Act and the Commerce Clause**.

Capozzi's second appellate argument is a Commerce Clause challenge to the Hobbs Act conviction.  Capozzi failed to raise this issue before the district court.  Therefore, we review it only for plain error.  See United States v. Newton, 327 F.3d 17, 26 (1st Cir. 2003).  Under this standard, we will reverse the Hobbs Act conviction on Commerce Clause grounds only if Capozzi can show (1) an error, (2) that is plain, and (3) that affects substantial rights.  See United States v. Olano, 507 U.S. 725, 732 (1993).  Capozzi's claim falters on the first prong of this analysis because

the Hobbs Act, as applied here, does not violate the Commerce Clause.

The Hobbs Act prohibits extortion or attempted extortion where such crime "in any way or degree, obstructs, delays or affects commerce." 18 U.S.C. § 1951(a). The Hobbs Act's scope extends to the limit of Congress' Commerce Clause authority. See Stirone v. United States, 361 U.S. 212, 215 (1960); United States v. DiGregorio, 605 F.2d 1184, 1190 (1st Cir. 1979). Because of the statute's broad sweep, to prove a Hobbs Act violation, the government must show only that the extortionate conduct created "a realistic probability of a de minimis effect on interstate commerce." United States v. Butt, 955 F.2d 77, 80 n.2 (1st Cir. 1992); see United States v. Devin, 918 F.2d 280, 293 (1st Cir. 1990); DiGregorio, 605 F.2d at 1190.

Capozzi contends that, in light of the Supreme Court's Commerce Clause decisions in United States v. Lopez, 514 U.S. 549 (1995) and United States v. Morrison, 529 U.S. 598 (2000), the "de minimis effect" on interstate commerce standard for establishing a Hobbs Act violation is unconstitutional. We reject this contention.

In Lopez, the Supreme Court addressed a Commerce Clause challenge to the Gun Free School Zones Act, a law which prohibited a person from possessing a gun while in a school zone. 514 U.S. 552-68. In declaring the statute unconstitutional, the Court

-18-

identified three categories of conduct which Congress may regulate under its Commerce Clause authority: (1) the use of channels of interstate commerce; (2) the instrumentalities of interstate commerce or persons or things in interstate commerce; and (3) activities that substantially affect interstate commerce. Id. at 558-59. The Court held that the proper test for evaluating a statute like the Gun Free School Zones Act, which neither regulated commercial activity nor contained a jurisdictional element requiring that the regulated activity be connected to interstate commerce, is whether the statute "substantially affects" interstate commerce. Id. at 559. Applying this test, the Court invalidated the Act because the "possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." Id. at 567.

Relying on the Lopez Court's "substantially affects" language, Capozzi contends that the "de minimis effect" standard for a Hobbs Act violation is no longer valid. In making this argument, Capozzi overlooks a crucial distinction between the statute at issue in Lopez and the Hobbs Act. In drafting the Hobbs Act, Congress included a jurisdictional element which it failed to include in the Gun Free School Zones Act. The Hobbs Act requires the government to prove that the extortion or robbery be connected to interstate commerce. 18 U.S.C. § 1951(a). Rather than applying

-19-

to all robberies or extortions, the Hobbs Act applies to only that specific subset of robberies or extortions that affects interstate commerce.[2]  See United States v. Perrotta, 313 F.3d 33, 36 (2d Cir. 2002) (citing cases where robbery or extortion held not to affect interstate commerce and thus not actionable under Hobbs Act). Thus, the Hobbs Act "ensure[s], through case-by-case-inquiry, that the [extortion or robbery] in question affects interstate commerce."  Lopez, 514 U.S. at 561.

In the Hobbs Act, Congress expressed its self-conscious recognition of the limits on its Commerce Clause power by restricting the statute's reach to conduct squarely within its authority-- a recognition notably absent from Congress' enactment of the Gun Free School Zones Act.  Congress' inclusion of a jurisdictional element in the Hobbs Act addresses the Lopez Court's constitutional concern that congressional authority under the Commerce Clause not become a "general police power of the sort retained by the States."  Lopez 514 U.S. at 567.  Accordingly, the

_____

[2] To distinguish the constitutional infirmity present in the Gun Free School Zones Act from statutes which contain a jurisdictional element, the Lopez Court relied on its decision in United States v. Bass, 404 U.S. 336 (1971), in which it rejected a Commerce Clause challenge to a statute similar to the Hobbs Act. Id. at 561-62.  The statute at issue in Bass made it unlawful for a felon to possess a firearm "in commerce or affecting commerce." Id. at 562.  This statute survived Commerce Clause scrutiny because it contained a jurisdictional element "which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce."  Id. at 562.  As discussed above, the Hobbs Act contains the same sort of limitation.

Lopez decision does not render the Hobbs Act's "de minimis effect" on interstate commerce standard unconstitutional.[3]

Our rejection of Capozzi's Commerce Clause challenge to the Hobbs Act is consistent with the decisions of several other circuits which have rejected similar challenges. See, e.g., United States v. Williams, -- F.3d --, 2003 WL 22038949, at *3 (4th Cir. Aug. 29, 2003); United States v. Clausen, 328 F.3d 708, 710-11 (3d Cir. 2003); United States v. Fabian, 312 F.3d 550, 554-55 (2d Cir. 2002); United States v. Lynch, 282 F.3d 1049, 1052 (9th Cir. 2002); United States v. Malone, 222 F.3d 1286, 1294-95 (10th Cir. 2000); United States v. Einfeldt, 138 F.3d 373, 379 (8th Cir. 1998); United States v. Valenzeno, 123 F.3d 365, 368 (6th Cir. 1997); United States v. Castleberry, 116 F.3d 1384, 1386-87 (11th Cir. 1997); United States v. Harrington, 108 F.3d 1460, 1465-66 (D.C. Cir. 1997). Accordingly, we hold that the Hobbs Act's "de minimis

---

[3] The same rationale distinguishes Morrison, the other case on which Capozzi relies. In Morrison, the Court invalidated the civil cause of action established by the Violence Against Women Act on Commerce Clause grounds. 529 U.S. 607-619. The Court invalidated the statute because it determined that Congress did not have the power to regulate "non-economic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." Id. at 617. The Court again criticized Congress for failing to include "a jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce." Id. at 613. Significantly, the Court also noted with approval that lower courts had rejected Commerce Clause challenges to other provisions of the Violence Against Women Act which contained jurisdictional elements. Id. at 613-14 n.5.

effect" on interstate commerce standard was constitutionally applied to Capozzi's conduct.

### C. Sufficiency of Evidence to Sustain the Hobbs Act Conviction.

Finally, Capozzi challenges the sufficiency of the evidence underlying the Hobbs Act conviction. He asserts that the government failed to meet its burden of establishing a nexus between his conduct and interstate commerce. Specifically, he asserts that his violent demand for reimbursement from Gardner Park did not have even a "de minimis effect" on interstate commerce.

We review de novo a district court's determination that the evidence was sufficient to submit the case to the jury. See United States v. Otero-Mendez, 273 F.3d 46, 50-51 (1st Cir. 2001). In doing so, we examine "all the evidence, direct and circumstantial, in the light most favorable to the prosecution, drawing all reasonable inferences consistent with the verdict, and avoiding credibility judgments, to determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt." United States v. Beckett, 321 F.3d 26, 33 (1st Cir. 2003). The evidence adduced at trial showed that Gardner Park was a business that bought cars from out-of-state. Capozzi, unhappy with the truck that he had purchased from Gardner Park, threatened violence in an attempt to extort McGrath, the owner of Gardner Park, to reimburse him $4,000 for the truck. On these facts, the jury reasonably could have concluded that if the extortion had been

-22-

successful, Gardner Park's assets would have been depleted by $4,000, at least until it could have resold Capozzi's truck to another customer.

One common method for the government to establish the required "de minimis effect" on interstate commerce is to show that the defendant's activity "minimally depletes the assets of an entity doing business in interstate commerce." United States v. Nguyen, 246 F.3d 52, 54 (1st Cir. 2001). To establish a Hobbs Act violation, the government need not show an actual deprivation of assets, but only that a deprivation of the victim's assets would have occurred had the defendant succeeded in the extortion. See United States v. Kattar, 840 F.2d 118, 122 (1st Cir. 1988) ("Attempted extortion is also proscribed by [the Hobbs Act] so that it is not material . . . whether the property was in fact obtained by the defendant.").

Here, if Capozzi had successfully extorted McGrath into giving him $4,000 in exchange for the return of the truck, Gardner Park would have been at least temporarily deprived of the use of the money that Capozzi initially paid for the truck. Such a temporary deprivation of the assets of a company engaged in interstate commerce satisfies the "de minimis effect" on interstate commerce element required for a successful Hobbs Act prosecution. See United States v. Stillo, 57 F.3d 553, 559 (7th Cir. 1995) ("the temporary depletion of . . . assets until repayment and the risk of

non-payment would be sufficient to satisfy the de minimis interstate commerce requirement"); see also United States v. Lewis, 797 F.2d 358, 365 (7th Cir. 1986) ("Even a temporary loss of the use of money constitutes a deprivation of property under [the Hobbs Act]."); United States v. Lance, 536 F.2d 1065, 1068 (5th Cir. 1976)(under the Hobbs Act the "loss of the use of money, even temporarily, must be considered a deprivation of property").

## III.

For the reasons set forth above, we **affirm** the convictions of defendant Derek Capozzi.