# United States Court of Appeals
## For the First Circuit

No. 02-2579

UNITED STATES OF AMERICA,

Appellee,

v.

JAMES McCORMACK,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Lynch, Circuit Judge,
Lipez, Circuit Judge, and
Garcia-Gregory,[*] District Judge.

Charles W. Rankin, with whom Rankin & Sultan was on brief, for appellant.
Kathleen A. Felton, Attorney, U.S. Department of Justice, with whom Michael J. Sullivan, U.S. Attorney, and George W. Vien and Michael D. Ricciuti, Assistant U.S. Attorneys, were on brief, for appellee.

June 8, 2004

[*]Of the District of Puerto Rico, sitting by designation.

**LYNCH**, <u>Circuit Judge</u>.  This case raises two issues: whether this Hobbs Act prosecution was within the scope of Congress's power under the Commerce Clause, and whether the defendant's sentence was in error in light of his acquittal on one count.

Seeking to extort money from James Carter, a former drug dealer, James McCormack helped plan and execute Carter's kidnapping and ransom.  After violently abducting Carter from his home, McCormack and his fellow kidnappers threatened to kill and torture him unless they were paid a million dollars.  When Carter pleaded that he only possessed about $300,000 in mutual funds and other non-liquid assets, the kidnappers agreed to release him and told him to liquidate his mutual funds in small increments until he could pay them $100,000.

McCormack was eventually apprehended and convicted by a jury of both attempting and conspiring to violate the Hobbs Act, 18 U.S.C. § 1951(a).  He was acquitted of using and carrying a firearm in relation to a crime of violence, <u>id.</u> § 924(c).  He was sentenced to serve 188 months in prison.

McCormack argues that there was insufficient evidence to support the Hobbs Act convictions because no rational jury could have found that his actions would have at least a de minimis effect on interstate commerce.  We reject this claim.  In doing so, we do not adopt the government's test that a particular amount of money

(here $100,000) is per se sufficient to meet the commerce element of a Hobbs Act offense. McCormack also argues that his sentence is plainly erroneous because it is longer than it would have been had the jury convicted, rather than acquitted, him of the firearm offense. This sentencing argument has a common-sense appeal, especially to anyone not familiar with the specialized world of the federal sentencing guidelines. But in this case, McCormack cannot show plain error because he cannot bear his burden of demonstrating that he was harmed. Consequently, we affirm his 188-month sentence.

**I.**

The facts are described, for purposes of McCormack's sufficiency of the evidence challenge, as a reasonable jury could have found them, in the light most favorable to the verdict. United States v. Casas, 356 F.3d 104, 109 (1st Cir. 2004).

Sometime in 1997, James McCormack was approached by his friend and fellow Charlestown, Massachusetts resident, James Dagle, and asked about his willingness to participate in the possible robbery or kidnapping of James Carter. Dagle, a long-time criminal, explained to McCormack that he had learned from his attorney, Fred Ford, that Carter had accumulated large sums of money in the early 1980s from selling marijuana. Although Carter was eventually convicted and served eighteen months in prison in the late 1980s, he was fined only $15,000, and his assets were not

-3-

forfeited. Dagle told McCormack that robbing or kidnapping Carter, who had recently moved back to the Boston area and was self-employed in the real estate business, could be potentially lucrative, and that Ford wanted to gauge McCormack's interest in participating in such a scheme.

McCormack, who independently knew that Carter had made a lot of money by selling drugs in the 1980s, told Dagle he was interested. Thereafter, Ford, Dagle and McCormack met several times to determine how they could find where Carter was living. Eventually, Ford learned that Carter was living with his family in Carlisle, Massachusetts. Ford[1] passed this information to McCormack and Dagle, who arranged to obtain Carter's address from records in the Carlisle Town Hall.

McCormack and Dagle started watching Carter's house to see if there was an opportunity to break in while nobody was home. After ten or fifteen multiple-hour surveillance missions, the pair determined that Carter's house was rarely, if ever, empty. They told Ford that they did not believe that burglary of Carter's house was a feasible option, and Ford urged them to pursue the kidnapping plan.

---

[1]Attorney Ford was eventually convicted of attempting to hire an undercover agent to kill McCormack and Dagle because he feared that they would cooperate with authorities against him in connection with the Carter kidnapping.

In early 1998, McCormack organized a meeting with Dagle and two other acquaintances he had recruited, Phil Myers and Richard Hegarty, to discuss kidnapping Carter. McCormack proposed that the group wait outside of Carter's house and abduct him from his driveway immediately after he returned home from dropping off his two children at school. McCormack was familiar with Carter's schedule as a result of his surveillance activities. The group also discussed who would obtain the necessary equipment for conducting the kidnapping, and Dagle was put in charge of procuring several handguns.

Less than an hour after the meeting ended, Dagle met with McCormack and provided him with the promised guns, but told him that he no longer wanted to participate in the kidnapping. With the help of Myers, McCormack replaced Dagle with Dennis Quirk. The reconstituted group, which included McCormack, Myers, Hegarty, and Quirk, met several more times to finalize the details of the plan. On about April 10, 1998, Hegarty and Myers stole two cars and a van for use in the kidnapping, which was planned to take place a week later.

On the morning of April 17, 1998, the four conspirators met at a designated location in Somerville, Massachusetts. They were joined by a fifth person, Francis Lang, whom Hegarty and Quirk had recruited. McCormack put the guns that Dagle had supplied in the stolen car, along with handcuffs, gloves and hats. At least

-5-

Quirk and Lang were given guns. McCormack, accompanied by Myers, then drove the stolen van up to Carter's house and waited in a small bend part-way up Carter's long driveway. The other three drove the stolen car to the school that one of Carter's children attended. When they saw Carter returning from dropping off his child at the school, they radioed McCormack and Myers and then followed Carter home.

When Carter pulled into his driveway, his path forward was blocked by the van; once Carter stopped his car, he was boxed-in from behind by the car driven by Hegarty. Myers and Quirk, who were wearing stockings over their heads and vests that read "FBI," approached Carter's SUV, and Myers told Carter that he was under arrest. Carter attempted to escape by ramming his SUV into the van; in response, Quirk fired his gun into the front of Carter's vehicle. Myers then pulled Carter out of the window of the jeep using a choke hold and dragged him into the van, where he was handcuffed, blindfolded, and bound with duct tape. In the process, Lang, who had gotten into the van, hit Carter in the face with the butt of a gun and broke several of his front teeth.

McCormack, who was driving the van, sped off once Carter was inside. Followed by Quirk, who was driving Carter's SUV, and Hegarty, who was still in the stolen car, McCormack drove the van to Charlestown. During the drive, Myers and Quirk threatened to kill Carter unless he paid them a million dollars. Carter

explained that he did not have that much money, but said that he did own about $300,000 in mutual funds.

After picking up Quirk, who had ditched Carter's SUV when it ran out of gas, McCormack drove the van to a warehouse in Charlestown. There, the kidnappers transferred the bound and blindfolded Carter into a laundry cart, which McCormack had arranged beforehand, and wheeled him inside the warehouse. The kidnappers took shifts interrogating Carter about how much money he had and where he kept it. Throughout, they hit Carter, poked him with knives, and threatened to torture him and cut off parts of his body. Carter pleaded that while he was once a marijuana dealer, he no longer dealt drugs; he had invested most of the money he made while dealing drugs in real estate, mutual funds, and stocks.

Eventually, McCormack told Carter that he would be released so that he could sell his mutual funds and turn over $100,000 to the kidnappers. Carter was instructed to liquidate his mutual funds slowly, in increments under $10,000, and was told that somebody named "Sam" would call him with follow-up instructions. If he refused to pay the money or contacted the police, Carter was told that both he and his family would be killed. Keeping Carter bound and blindfolded, the kidnappers then removed his bloodied clothing, dressed him in new clothing, and dropped him off at the side of a road in Woburn, Massachusetts. Carter eventually found his way to a telephone and contacted his family.

-7-

The following day, after Carter spoke with his attorney, he reported the kidnapping to the Carlisle police. He also had extensive dental work done on his broken front teeth and learned that he had suffered a small stroke during the ordeal. As a result of the stroke, Carter suffers from several permanent disabilities: he slurs his speech, has a slight limp, and has problems maintaining his balance.

Several days after Carter reported the kidnapping to the police, his SUV, which had a bullet hole in its fender, was recovered. Carter also received several messages from "Sam" on his answering machine; the voice was McCormack's. But it was not until Myers was arrested in September of 1998 on an unrelated matter that the police learned who was behind Carter's abduction. Myers led officers to Dagle, who agreed to cooperate with authorities. Dagle recorded several conversations with McCormack in which the two discussed the Carter kidnapping and whether they would be caught by the police.

On December 21, 2000, a superseding indictment was filed in the District of Massachusetts that charged McCormack, inter alia, with conspiring and attempting to obstruct commerce by robbery and extortion, 18 U.S.C. § 1951(a) (Hobbs Act), and with using and carrying a firearm during and in relation to a crime of

violence, id. § 924(c).[2]  After a five-day trial in which both Dagle and Myers testified and McCormack's incriminating recorded statements were presented to the jury, McCormack was convicted on the Hobbs Act counts, but acquitted of the firearm charge.  On November 5, 2002, the district court sentenced McCormack to 188 months of imprisonment.

**II.**

A.  Sufficiency of the Evidence

Because McCormack moved under Fed. R. Crim. P. 29 for a judgment of acquittal at the close of evidence, he has fully preserved his challenge to the sufficiency of the evidence. United States v. Van Horn, 277 F.3d 48, 54 (1st Cir. 2002).  Our review is de novo. United States v. Cornier-Ortiz, 361 F.3d 29, 32 (1st Cir. 2004).  The issue is whether a rational factfinder, considering all of the evidence in the light most favorable to the verdict, could have found beyond a reasonable doubt that Carter's kidnapping "in any way or degree obstruct[ed], delay[ed] or affect[ed] commerce," 18 U.S.C. § 1951(a).  See United States v. Boulerice, 325 F.3d 75, 79 (1st Cir. 2003) (standard of review for denials of Rule 29 motions).

---

[2]The indictment also charged McCormack with conspiracy and attempt to possess with the intent to distribute five kilograms or more of cocaine.  These counts were dismissed before trial and are not at issue here.

The commerce element of a § 1951(a) offense extends to the limit of Congress's Commerce Clause authority. <u>Stirone</u> v. <u>United States</u>, 361 U.S. 212, 215 (1960); <u>United States</u> v. <u>Capozzi</u>, 347 F.3d 327, 335 (1st Cir. 2003). It reaches all conduct that creates a "realistic probability of a de minimis effect on interstate commerce." <u>Capozzi</u>, 347 F.3d at 335 (quoting <u>United States</u> v. <u>Butt</u>, 955 F.3d 77, 80 n.2 (1st Cir. 1992)). Under this standard, it is the purpose of the conspiracy, rather than the result the conspirators achieve, that is relevant in determining the impact on commerce. <u>United States</u> v. <u>Nguyen</u>, 246 F.3d 52, 54 (1st Cir. 2001). Importantly, the de minimis test under the Hobbs Act remains applicable after the Supreme Court's Commerce Clause decisions in <u>United States</u> v. <u>Lopez</u>, 514 U.S. 549 (1995), and <u>United States</u> v. <u>Morrison</u>, 529 U.S. 598 (2000). <u>See</u> <u>Capozzi</u>, 347 F.3d at 335-36.

The government contends that the kidnappers' extortionate demand of $100,000, standing alone, is sufficient to satisfy the Hobbs Act's commerce element under the de minimis effects test. It argues that any reasonable factfinder would conclude that, in order to satisfy such an exorbitant demand, the victim would need to liquidate assets in a manner affecting interstate commerce.

We decline to adopt any bright-line rule that an extortionate demand of a certain sum from an individual can automatically satisfy the commerce element of the Hobbs Act.

Determining whether an act has a reasonable probability of having a "de minimis effect" on interstate commerce inherently requires a multifaceted and case-specific inquiry. See United States v. Carcione, 272 F.3d 1297, 1301 n.6 (11th Cir. 2001) ("[W]e have repeatedly held that in determining whether there is a minimal effect on commerce, each case must be decided on its own facts." (internal quotation marks omitted)). Moreover, it is far from clear that, as the government asserts, a $100,000 demand would necessarily require transactions affecting interstate commerce in every case: many people would simply have no way of gathering $100,000 together, whereas those specifically targeted because of their access to money may well be able to satisfy such a demand without resort to large financial transactions affecting interstate commerce. Finally, the government's proposed standard does not adequately distinguish between the extortion or robbery of a business and that of an individual.

McCormack, ably represented, seizes on this last point to argue that the evidence is too attenuated here because the victim was an individual rather than a business or institution and was targeted because he was believed to have cash on hand. He correctly points out that the victim's connection to a business entity is an important, though not dispositive, consideration in determining whether the commerce element of a Hobbs Act violation can be met. Cf. United States v. Perrotta, 313 F.3d 33, 36 (2d

-11-

Cir. 2002) (there is a significant distinction between "the extortion of an individual and the extortion of a business for the purposes of establishing Hobbs Act jurisdiction"). Because criminal acts that are directed at individuals rather than at businesses normally have a less substantial effect on interstate commerce, courts have often required a heightened showing of an effect on commerce to sustain such Hobbs Act convictions. See id.; United States v. Lynch, 282 F.3d 1049, 1054 (9th Cir. 2002); United States v. Wang, 222 F.3d 234, 238-40 (6th Cir. 2000); United States v. Quigley, 53 F.3d 909, 910-11 (8th Cir. 1995).

The evidence here satisfies this heightened standard. A reasonable jury could have concluded that there was a "realistic probability" that the kidnapping would have a de minimis effect on interstate commerce. Nguyen, 246 F.3d at 54. Here, the kidnappers specifically instructed Carter to liquidate $100,000 of his mutual funds after they learned that he could not meet a one million dollar demand. These funds, both parties agree, were managed by companies in interstate commerce and were themselves traded in interstate commerce; if Carter had sold them, as the kidnappers had demanded, both parties agree that "the sale would have reduced the value of the companies that managed the funds and the mutual funds themselves." Numerous courts have opined that the extortion of an individual can satisfy the commerce element of the Hobbs Act when it "cause[s] or create[s] the likelihood that the individual will

-12-

deplete the assets of an entity engaged in interstate commerce." United States v. Collins, 40 F.3d 95, 100 (5th Cir. 1994); see also Lynch, 282 F.3d at 1054-55; United States v. Diaz, 248 F.3d 1065, 1085 (11th Cir. 2001). The kidnappers' demand did just that.

Further, the kidnappers told Carter to liquidate his mutual funds slowly, in increments under $10,000. A rational jury could have concluded that the purpose of this instruction was to evade federal regulatory oversight of large financial transactions. Cf. 31 U.S.C. § 5313; 31 C.F.R. § 103.22 (requiring many financial institutions to file currency reports when they participate in a transaction involving currency of more than $10,000). The jury could have concluded that the kidnappers' instruction to Carter directly undermined the federal regulation of substantial monetary transactions, and thus affected interstate commerce. Taken in conjunction with the instruction to liquidate appreciable sums from mutual funds that were traded in interstate commerce, the jury had more than sufficient evidence to conclude rationally that there was a reasonable probability that McCormack's criminal activity, if successful, would have had a de minimis effect on interstate commerce.

B. McCormack's Sentence

McCormack also challenges the 188-month sentence he received, which he says violates the Sentencing Commission's statutory mandate to "provid[e] certainty and fairness in

sentencing and reduc[e] unwarranted sentence disparities." 28 U.S.C. § 994(f). McCormack admits that he did not raise this issue in front of the district court, and so our review is only for plain error. United States v. Olano, 507 U.S. 725, 733-36 (1993). Under the plain error test, McCormack bears the burden of demonstrating "(1) an error, (2) that is plain, (3) that affects substantial rights (i.e., the error was not harmless), and (4) that seriously undermines the fairness, integrity, or public reputation of judicial proceedings." United States v. Fazal-Ur-Raheman-Fazal, 355 F.3d 40, 48 (1st Cir. 2004); see United States v. Geronimo, 330 F.3d 67, 74-75 (1st Cir. 2003) (burden is on the defendant).

McCormack's argument is that his sentence is longer than it would have been if the jury had convicted, rather than acquitted, him of the firearm charge. The reason, claims McCormack, is that the district court increased his base offense level by seven for his Hobbs Act offenses because a firearm was discharged in the course of the kidnapping.[3]   U.S.S.G. §

---

[3]This enhancement was permissible even though McCormack was acquitted of the firearm offense.  There are differences in both the standard of liability and the government's burden of proof between the § 924(c) offense and the sentencing enhancements for possession or use of a firearm.  The crime requires proof beyond a reasonable doubt that the firearm was, actually or constructively, carried or used in a crime of violence.  See United States v. Cruz, 352 F.3d 499, 509-10 (1st Cir. 2003).  The sentencing enhancements relating to firearms, by contrast, require only proof by a preponderance of the evidence of the relevant conduct.  See United States v. Rodriguez, 112 F.3d 26, 28 (1st Cir. 1997).  Even if the conduct involved is the same, acquitted conduct may be used for sentencing.  Id.

2B3.2(b)(3).  As a result of this seven-level enhancement (which McCormack admits was applicable on its face), McCormack's total offense level increased from 28 to 35,[4] which, given his Criminal History Category of II, raised the applicable sentencing range from 87-108 months to 188-235 months, see id. ch. 5 pt. A.  The judge sentenced McCormack at the low end of this range, imposing a 188-month sentence.

But if the jury had convicted him of the firearm charge pursuant to § 924(c), McCormack argues, then the Sentencing Guidelines would have directed the judge not to apply the firearm enhancement.  See id. § 2K2.4 cmt. 4.  Although the § 924(c) conviction would have added 60 months to his sentence,[5] see 18 U.S.C. § 924(c)(1), this would have resulted in a sentencing range of only 147-168 months, which, even if the judge imposed the

---

[4]The base offense level under the Guidelines is 18, but McCormack also received several other enhancements, which are not challenged on appeal, that increased his offense level to 28. These included a two-level enhancement because the offense involved the express or implied threat of death, § 2B3.2(b)(1); a two-level enhancement because the amount demanded was more than $50,000 but less than $250,000, § 2B3.1(b)(7); a two-level enhancement due to the victim's bodily injury, § 2B3.2(b)(4)(A); and a four-level increase because a person was abducted to facilitate the offense, § 2B3.2(b)(5).

[5]The statute was amended in 1998 to provide for a ten-year sentence when a firearm is discharged.  Pub. L. No. 105-386, § 1(a), 112 Stat. 3496, 3496 (Nov. 13, 1998).  At the time of the offense, however, the statute provided for only a five-year sentence.

maximum, is still 20 months fewer than the 188-month sentence he received.

As McCormack admits, the Sentencing Guidelines anticipate this anomaly. To avoid the possibility of inconsistent sentences, the application notes to the provision dealing with violations of § 924(c), provide, in relevant part, that:

> In a few cases in which the defendant is determined not to be a career offender, the offense level for the underlying offense . . . may result in a guideline range that, when combined with the mandatory consecutive sentence under 18 U.S.C. . . . § 924(c). . . , produces a total maximum penalty that is less than the maximum of the guideline range that would have resulted had there not been a count of conviction under 18 U.S.C. . . . § 924(c) . . . (i.e., the guideline range that would have resulted if the enhancements for possession, use, or discharge of a firearm had been applied). <u>In such a case, an upward departure may be warranted so that [a] conviction under . . . § 924(c) . . . does not result in a decrease in the total punishment.</u> An upward departure under this paragraph shall not exceed the maximum of the guideline range that would have resulted had there not been a count of conviction under 18 U.S.C. . . . § 924(c). . . .

U.S.S.G. § 2K2.4 cmt. 4 (emphasis added). <u>See generally</u> <u>United States</u> v. <u>Hickey</u>, 280 F.3d 65, 68 (1st Cir. 2002). Several courts have affirmed such upward departures. <u>See, e.g.</u>, <u>United States</u> v. <u>Banks-Giombetti</u>, 245 F.3d 949, 953-54 (7th Cir. 2001); <u>United States</u> v. <u>Collins</u>, 226 F.3d 457, 465-66 (6th Cir. 2000); <u>United States</u> v. <u>Johnson-Dix</u>, 54 F.3d 1295, 1310-11 (7th Cir. 1995). The government reasons that because of this provision it is not likely that McCormack would have received a lesser sentence had he been convicted of the § 924(c) charge.

-16-

McCormack contends that this solution is insufficient to meet the statutory mandate of avoiding unwarranted disparities in sentences because the district court retains discretion not to depart upward when a § 924(c) conviction has the effect of reducing a defendant's sentence. McCormack says that the result of this discretion is that it is preferable in certain circumstances, from the defendant's point of view, to be <u>convicted</u> under § 924(c). The sentencing range in such cases can be no higher than if the defendant were acquitted, <u>see</u> § 2K2.4 cmt. 4, and there is at least the possibility of convincing a sympathetic judge not to depart upward. Because of this potential, McCormack argues that the Guidelines are inconsistent with the statutory command in 28 U.S.C. § 944(f).

We are doubtful that the mere potential for a disparity in sentences is enough to put the Guidelines and statute into conflict, especially given the application note. The existence of a potential disparity is nonetheless a very good reason for defense counsel to present the issue to the sentencing judge. That was not done here. We cannot say that there was plain error because McCormack cannot show that his "substantial rights" were affected. <u>Fazal-Ur-Raheman-Fazal</u>, 355 F.3d at 48. There is no reason to assume that if McCormack had been convicted of the firearm offense in § 924(c) then he would have been sentenced according to the 147-168 month range that he calculates. The district court may well

-17-

have departed upward, as encouraged by the Guidelines.  In fact, the district court could have departed upward beyond the 188-month sentence that McCormack received, up to 235 months, the maximum of the Guidelines range that McCormack faced.  See § 2K2.4 cmt. 4. McCormack's acquittal on the § 924(c) count may well have been what influenced the judge to sentence at the low end of the available range.  We add that the use of firearms during the kidnapping was a very serious matter, and the judge was well within his authority in giving the sentence that he did.

### III.

McCormack's conviction and sentence are **affirmed**.