LIPEZ, Circuit Judge,
dissenting in part.
I respectfully disagree with the majority’s conclusion that the evidence in this *294 case was sufficient to allow the jury to find that appellants’ robbery affected interstate commerce within the meaning of the Hobbs Act. The interstate commerce element of the statute serves the important function of establishing a federal interest in crimes that are typically the concern of state criminal law, and it is thus a critical component of a Hobbs Act violation. Although I recognize that “a de minimis effect” will suffice to meet the commerce element, United States v. Capozzi 347 F.3d 327, 335 (1st Cir.2003), the evidence here falls short of even that modest requirement. I therefore would reverse appellants’ convictions on Counts One and Two.[17]
There is no doubt that the lottery business was impacted in ways that would establish an effect on interstate commerce if the business were regularly involved in such commerce. As the majority notes, the interstate commerce element of the Hobbs Act is often proven in a robbery case by showing that the crime depleted the assets of a business engaged in interstate commerce, see United States v. Rodriguez-Casiano, 425 F.3d 12, 15 (1st Cir.2005), or forced such a business to close, even temporarily, see United States v. Cruz-Rivera, 357 F.3d 10, 14 (1st Cir.2004). Either of those situations potentially affects the company’s ability to conduct business as usual, thereby “creat[ing] ‘a realistic probability’ ” of preventing transactions in interstate commerce. Capozzi 347 F.3d at 335 (“[T]he government must show only that the ... conduct created ‘a realistic probability of a de minimis effect on interstate commerce.’ ” (quoting United States v. Butt, 955 F.2d 77, 80 n. 2 (1st Cir.1992))); see also United States v. De-Cologero, 530 F.3d 36, 68 (1st Cir.2008). I thus agree with the majority that the lottery business’s closure for a day and its loss of $9,000 would cause the kind of impact required by our cases.[18]
*295 My problem is that the evidence did not show the necessary involvement by the business in interstate commerce. To be sure, Muniz’s enterprise used equipment— the lottery and gaming machines — that were manufactured outside Puerto Rico. Missing from the record, however, is any indication of future transactions in interstate commerce. There was no evidence that Muniz purchased machines for the business regularly or planned to acquire one at any point in the foreseeable future.[19] Nor was there evidence that the business engaged in any other interstate transactions in the ordinary course of its business. Although it seems plausible that the paper used in printing lottery tickets might come from outside Puerto Rico and that the supply might need regular replenishing, or that Mufiiz might have had a maintenance contract with the Rhode Island manufacturer to regularly service his machines, no evidence of such dealings was presented. Thus, the record lacks proof of future interstate purchasing by Muñiz’s business on which the robbery could have had an impact.[20]
The majority asserts that it is reasonable to infer that the lottery business was engaged in ongoing interstate commerce because “[a] jury would need no special background knowledge or particular evidence to infer that machines, games, screens and cables become obsolete or are broken and must be replaced.” It cites Muñiz’s testimony that all of the equipment associated with the machines — “the screens, the cables, the whole of the inside of the game” — came from the United States mainland. But the Hobbs Act requires proof that this particular robbery potentially impeded the business’s interstate dealings, see Capozzi, 347 F.3d at 336 (“[T]he Hobbs Act ‘ensure[s], through case-by-case inquiry, that the [extortion or robbery] in question affects interstate commerce.’”) (quoting United States v. Lopez, 514 U.S. 549, 561, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)), and the possible purchase of replacement equipment at some undefined point in the future does not suffice to establish that nexus. Neither the business’s closure for a day nor its loss of cash proceeds can reasonably be presumed to affect a transaction that may not occur for years.
The majority contends that reading Muñiz’s testimony to indicate that his business “only dealt in interstate products one time” would be to view the evidence in the light most favorable to the defendants, *296 contrary to our obligation to view the testimony in the light most favorable to the verdict. I am not suggesting, however, that the jury could not reasonably infer that Mufiiz at some point would make additional purchases of machines and parts, but only that the record contains no evidence of the frequency of such purchases or whether any such transaction was anticipated in reasonable proximity to the robbery. In the absence of such evidence, it would be rank speculation for the jury to find that this robbery had an impact on interstate commerce.
In relying on the lottery business’s past acquisition of equipment, without any evidence of future purchases, the majority takes a significant step beyond the precedent it invokes. Implicit in the cases is a requirement that the victim company’s interstate activity occur in the regular course of its business, such as when a firm’s stock in trade is a product acquired from an out-of-state supplier or when, as in the case of a hotel, the business by its nature depends on out-of-state customers. See, e.g., United States v. Jiménez-Torres, 435 F.3d 3, 8 (1st Cir.2006) (Puerto Rico gas station purchased gasoline from a refinery in the Virgin Islands); Rodriguez-Casiano, 425 F.3d at 14 (Puerto Rico businesses obtained much of their inventory from mainland suppliers); United States v. Hemingway, 108 Fed.App’x 83, 85 (4th Cir.2004) (noting that victim hotel was part of a national chain that received supplies from out-of-state and that most of the hotel’s guests were from out-of-state); Capozzi, 347 F.3d at 337 (car dealership that bought cars from out-of-state); United States v. Rodriguez, 218 F.3d 1243, 1244 (11th Cir.2000) (per curiam) (robbery of motels); United States v. Pearson, 508 F.2d 595, 596-97 (5th Cir.1975) (per curiam) (robbery of a hotel). This requirement makes sense. Where the robbed establishment engages in interstate commerce on a regular basis, an interstate impact can be presumed from the mere fact that the crime occurred.
Thus, the majority misses what I see as a clear distinction between businesses whose merchandise or supplies include products regularly obtained by means of interstate commerce, requiring repeated future transactions to replenish inventory, and businesses whose only connection with interstate commerce was the initial purchase of the materials or equipment needed to set up the company. A robbery of the latter type of business would potentially affect interstate commerce only coincidentally, i.e., if a purchase of replacement equipment happened to be imminent. When a business is involved in interstate commerce every day, however, there is a “realistic probability” that any depletion of assets or forced closure would have an effect on interstate commerce. See, e.g., United States v. Hebert, 131 F.3d 514, 523 n. 8 (5th Cir.1997) (“[A] showing that the business regularly buys goods from out of state allows an inference that the robbery will impair a future purchase.”).
The majority alternatively points to evidence that the lottery business served tourists from out-of-state, relying on cases involving motels and hotels to assert that evidence of past out-of-state customers is enough of a nexus to interstate commerce to satisfy the statutory requirement. The hotel context is not, however, equivalent to the circumstances in this case. The hotel industry focuses on attracting travelers from outside the local area, and out-of-state tourists routinely book hotel or motel accommodations from their home locations. In effect, out-of-state guests are part of the “stock in trade” of a hotel business, and many of those guests’ interactions with the hotel can reasonably be presumed to occur across state lines. In addition, hotels routinely advertise their accommo *297 dations to residents of other states. Thus, when the evidence shows that a hotel serves out-of-state guests, a jury reasonably may infer that the business is engaged in activities that implicate interstate commerce on a regular basis, and there is a “realistic probability” that any depletion of its assets would affect that commerce.[21]
By contrast, there is no evidence in this case permitting an inference that Muñiz’s sale of lottery tickets to tourists ordinarily involved interstate commerce, nor any evidence of “ ‘a realistic probability’ ” that interstate commerce was affected by the robbery at issue here. See Capozzi 347 F.3d at 335. A sale of locally produced merchandise (here, the lottery ticket) does not become an interstate transaction simply because the purchaser, who is buying locally, happens to hail from out-of-state.
I recognize that, in enacting the Hobbs Act, Congress intended “ ‘to use all [its] constitutional power ... to punish interference with interstate commerce by extortion, robbery, or physical force.’ ” Jiménez-Torres, 435 F.3d at 7 (quoting Stirone v. United States, 361 U.S. 212, 215, 80 S.Ct. 270, 4 L.Ed.2d 252 (I960)). At the same time, however, the Supreme Court’s discussions of the Commerce Clause in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), and United States v. Morrison, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), should give us pause before further expanding its reach into traditionally local concerns. Indeed, the Court in Morrison explicitly recognized the singular role of the states with respect to violent crime: “[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.” Morrison, 529 U.S. at 618, 120 S.Ct. 1740; see also Lopez, 514 U.S. at 557, 115 S.Ct. 1624 (noting that “the scope of the interstate commerce power ‘must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them .... would effectually obliterate the distinction between what is national and what is local’ ”) (citation omitted).
In Capozzi 347 F.3d at 335-36, we concluded that Lopez and Morrison did not invalidate the de minimis effect standard for Hobbs Act violations and replace it with a “substantially affects” test because — unlike the statutes at issue in those cases — the Hobbs Act includes a jurisdictional element that “ ‘ensure[s], through case-by-case inquiry, that the [extortion or robbery] in question affects interstate commerce.’ ” Id. at 336 (quoting Lopez, 514 U.S. at 561, 115 S.Ct. 1624). We observed that “Congress’ inclusion of a jurisdictional element in the Hobbs Act addresses the Lopez Court’s constitutional concern that congressional authority under the Commerce Clause not become a ‘general police power of the sort retained by the States.’ ” Id. (quoting Lopez, 514 U.S. at 567, 115 S.Ct. 1624).
*298 The Supreme Court arguably distinguished crimes with a jurisdictional element from the statutes it invalidated in Lopez and Morrison because the interstate commerce element ensures the presence of a federal interest — justifying federal prosecution — in offenses that otherwise replicate traditional state crimes. Although we concluded in Ca/pozzi that the “de minimis effect” standard continues to be sufficient to identify the federal interest, that standard cannot be applied so loosely that the interstate commerce element no longer serves to distinguish between federal and state crimes. Otherwise, we risk turning every routine robbery into a federal offense. See Jiménez-Torres, 435 F.3d at 14-15 (Torruella, J., concurring).
In my view, that is what the majority has done here with a de minimis effect analysis that reduces this concept to a meaningless verbal incantation. Indeed, virtually every business uses some item that was made in another state — perhaps a table or a rug or paint on the walls. If speculation about future replacement of such items suffices to establish the interstate commerce nexus, the Hobbs Act would embrace virtually all local robberies. Similarly, the happenstance that a tourist purchases locally produced merchandise does not transform that purchase into an interstate transaction. Otherwise, the robbery of a fruit peddler’s stand that is patronized by tourists becomes a Hobbs Act violation. On the record before us, the majority’s conclusion that the jury could find a nexus between the defendants’ robbery and interstate commerce is an exercise in imagination that places this case beyond the outer boundaries of our prior precedent. I cannot agree to such an expansion of the law.

. As the majority notes, the defendants did not specifically refer to the interstate commerce element in making their Rule 29 motion. The district court did not give them the opportunity to do so. After the court ended a discussion concerning pretrial identification by saying that it would give the jury a specific instruction on identification procedures, the colloquy continued as follows:
DEFENSE COUNSEL: Other than that, we pray the Court to grant a Rule 29 and enter a not guilty verdict on this particular case at this time, because I submit that there is insufficient evidence for the robbery, the firearm, and the fact—
COURT: I think there is overwhelming evidence of the fact that this robbery took place as testified to by the witnesses. Motion denied.
OTHER DEFENSE COUNSEL: We adopt the motion.
COURT: Anything else?
GOVERNMENT: [returning to identification issue]
In these circumstances, I would not apply plain error review. In any event, I believe the government's failure to prove the interstate commerce element constitutes plain error.

. The government has long prosecuted Hobbs Act cases in Puerto Rico assuming that it must prove an impact on interstate commerce rather than on commerce within the Commonwealth. In response to the panel’s request for supplemental briefing, the government now argues that the interstate commerce requirement applies only to crimes that occur in the fifty states and not to those committed in other United States jurisdictions. See United States v. Liburd, 291 F.Supp.2d 383, 385-86 (D.Vi.2003) (holding the requirement inapplicable to territories or possessions). It relies on the Act's definition of "commerce” as including “commerce within ... any Territory or Possession of the United States.” 18 U.S.C. § 1951(b)(3).
However, as the government points out, even if the full panel agreed that it is unnecessary to prove an effect on interstate commerce for Hobbs Act violations in Puerto Rico, that construction of the statute would be inapplicable in this case because the charges were brought, and the jury was instructed, based on the interstate commerce requirement. See McCormick v. United States, 500 U.S. 257, 270 n. 8, 111 S.Ct. 1807, 114
*295 L.Ed.2d 307 (1991) (“Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.”); Chiarella v. United States, 445 U.S. 222, 236, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) ("[W]e cannot affirm a criminal conviction on the basis of a theory not presented to the jury.”). Thus, even if I accepted the government's new understanding of the Hobbs Act as it applies to Puerto Rico, it would not affect my view of the sufficiency of the evidence in this case. I therefore do not discuss the merits of that argument.

. Indeed, the evidence suggests that Mufiiz did not even purchase the lottery machines himself, but obtained them from the Commonwealth’s Department of the Treasury, which brought them to Puerto Rico through an arrangement with the manufacturer. Because I believe the interstate commerce element would not be satisfied even if Mufiiz had purchased the machines himself, I need not dwell on this further complication.

. I note my agreement with the majority that the interstate commerce element would be satisfied if a business purchased its inventory from an in-state supplier that obtained the products from out of state. Such interstate activity, although indirect, is nonetheless ongoing, and a robbery of the business would have the same impact on the future purchase of out-of-state goods as it would if the products were purchased directly from an out-of-state source.

. The majority quotes the Eleventh Circuit's statement in Rodriguez that evidence that the victim motels had “at some point'' registered out-of-state guests was enough to establish a connection to interstate commerce. I do not understand that decision to endorse a Hobbs Act conviction where the robbed business had only a past relationship with interstate commerce. Rather, the fact that the motel had previously served out-of-state guests allowed the inference that its customary operations included such customers. In other words, a jury reasonably could find based on its clientele that the motel was regularly engaged in transactions involving interstate commerce. See also Pearson, 508 F.2d at 597 (noting that "[t]he evidence established that this hotel entertained a large number of out of state visitors, thus establishing the required interstate nexus”).