# United States Court of Appeals

# For the First Circuit

Nos. 05-2495, 05-2498

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ RIVERA-RIVERA,
RAMÓN SÁNCHEZ-ROSADO,

Defendants-Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Lipez, Baldock[*] and Howard, Circuit Judges.

Linda Backiel for appellant Sanchez.
Mauricio Hernández-Arroyo for appellant Rivera.
Timothy R. Henwood, Assistant United States Attorney, with
whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson
Pérez-Sosa, Assistant United States Attorney, and Germán A.
Rieckehoff, Assistant United States Attorney, were on brief for
appellee.

February 9, 2009

---

[*]Of the United States Court of Appeals for the Tenth Circuit,
sitting by designation.

**HOWARD**, **Circuit Judge**.  Appellants José Rivera-Rivera ("Rivera") and Ramón Sánchez-Rosado ("Sánchez") were convicted on three counts stemming from the armed robbery of a lottery ticket business in Caguas, Puerto Rico.  Rivera was sentenced to 415 months' imprisonment – more than 34 years – and Sánchez was sentenced to 397 months – just over 33 years.  Both sentences included a mandatory minimum term of 25 years for the use of a firearm in relation to a violent federal felony after a previous conviction for the same offense.  See 18 U.S.C. § 924(c)(1)(C)(i). By statute, the 25-year term was required to be imposed consecutively to any other sentence.  The appellants challenge both their convictions and their sentences.  They claim two trial errors:  (1) the key witness's in-court identification was tainted by unnecessarily suggestive pretrial encounters, and (2) the government failed to meet its burden of proving that the robbery affected interstate commerce.  They also assert multiple flaws in their sentencing, including that the court improperly imposed the 25-year mandatory minimum based on facts not found by the jury beyond a reasonable doubt.  We affirm.

## I. FACTUAL BACKGROUND

The facts of the robbery, as the jury could have found them, are as follows.  Shortly after 8 a.m. on the morning of October 11, 2004, Carmelo Fonseca, the manager of the Muñiz Gallery, a small shopping mall in Caguas, opened both the front and rear entrances to the building, turned on the machines in the mall's game center, and started walking toward the office of the

-2-

lottery ticket business run by the Gallery's owner, Félix Muñiz. At 8:20 a.m., before the mall was open for customers, two individuals entered the mall through the back entrance. They approached Fonseca and asked him where the lottery machines were located, and then each pulled out a gun. One of them "loaded [his] pistol and charged it," and, after warning Fonseca "not to act like some tough guy, that they would shoot [him]," they directed Fonseca to take them to the lottery business office on the second floor. Although the men told Fonseca not to look at them, he testified that he did not comply and that "every time I had a chance, I looked at them." Fonseca reported that one of the individuals was wearing a white shirt and the other wore a black shirt. On direct examination, Fonseca indicated that both men were wearing sunglasses and hats. On cross-examination, he testified that one of them was wearing dark glasses and the other was wearing a hat. One of the men was carrying a black plastic bag of the type used by retail stores.

Meanwhile, across the hallway from where the three men were having their initial conversation, Dr. Johanna Loyola, an optometrist who had just arrived at her office, noticed the young men with Fonseca and saw that one had a pistol. She immediately called 911 to report a robbery, describing the perpetrators as young men with dark glasses and caps, and also shouted to the mall's maintenance employee, María, to get help because Fonseca was being robbed. In her phone call to the police, Loyola stated that one of the men did not seem tall, but looked strong.

María found a municipal police officer, Juan Soto, outside the mall. Soto went in through the back entrance, which he closed, proceeded to the front of the building, and padlocked the front door. He then called for backup. By this time, the two robbers had taken Fonseca upstairs, where he was forced to open the office safe. Because he was nervous, Fonseca made several attempts before he successfully opened the combination lock. The men then ordered him to get face down on the floor, and they tied his arms and legs with black ties taken from the black bag. They took a cash box containing $8,770 from the safe, and a gun and photographs from Muñiz's desk.

Outside the building, Puerto Rico Police Department officers and municipal officers, including Soto and Caguas officer Eliseo Martínez, had gathered in response to Soto's request for backup and Loyola's call. Soto removed the padlock from the front door and prepared to enter the building. He and Martínez testified that they could see two individuals in the vicinity of Muñiz's office. One wore blue jeans and a white t-shirt, had on dark glasses and was carrying a black bag with shiny lettering; the other wore a black shirt and blue jeans and was holding a fisherman's cap in his right hand. Ignoring Soto's order to halt, the men walked to the end of the hallway, found the back door closed, and then walked back down the hallway trying the doors of the businesses they passed. None were open, and the pair went into the men's restroom at the end of the hall. As they entered the bathroom, they lifted their shirts, and Soto saw pistol butts in

their waistbands. The two men -- defendants Sánchez and Rivera -- came out several minutes later, at which point Martínez arrested them.

In a trash can in the bathroom, Soto found the black bag with the shiny letters, which contained some dollar bills; a metal box; the fisherman's cap he had seen one of the men holding; some black straps; and a .38-caliber revolver belonging to Muñiz. Soto also found two loaded pistols inside a towel dispenser.

Fonseca was released by a municipal police officer and shortly thereafter saw Martínez escorting the defendants, in handcuffs, out of the building. Fonseca testified that he immediately recognized them as the robbers. He saw the defendants again about an hour later at the Caguas municipal police station, where he had gone to file charges. Fonseca testified that he happened to notice them as they walked back and forth inside a holding cell. On cross-examination, Fonseca stated that he also saw them in two locations at the courthouse where the defendants' preliminary hearing was held: in a cell at the district attorney's office and then "standing in front of the judge." Soto testified that Fonseca also saw the defendants briefly as they were being moved from the police station to the patrol car to be transported to the courthouse.

Charges originally were brought against Sánchez and Rivera under local law, but they were later dismissed and the men were charged in a three-count federal indictment. Count One alleged that the defendants aided and abetted each other in

-5-

committing an armed robbery affecting interstate commerce in violation of the Hobbs Act, 18 U.S.C. §§ 1951(a) and 2. Count Two charged the use of a firearm in connection with the robbery, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2. Count Three charged defendants with being felons-in-possession of a firearm, in violation of 18 U.S.C. §§ 922(g)and 924(a)(2), and alleged that they had been convicted in 1998 for an armed bank robbery.

At trial, Fonseca was asked if the men who robbed him were in the courtroom, and he identified the defendants. When asked by the prosecutor and the court to explain the basis for his conclusion that these were the men, he said that he "recognized them because they were the ones that robbed me." For purposes of Count Three, the felon-in-possession charge, the government and the defendants stipulated that Rivera and Sánchez had a triggering prior felony, and no evidence of the prior conviction was presented to the jury.

At the end of the government's case, the defendants sought suppression of Fonseca's identification testimony on the ground that he had been exposed to unnecessarily suggestive pre-trial confrontations with the defendants. The court refused to suppress the statement identifying the defendants as the perpetrators, but agreed to give the jury a specific instruction on identification procedures. Defense counsel also moved for a judgment of acquittal under Fed. R. Crim. P. 29, claiming that the evidence was insufficient to support a finding of guilt. The court denied the motion, observing that "there is overwhelming evidence

of the fact that this robbery took place as testified to by the witnesses." The jury subsequently found both defendants guilty on all three counts.

On appeal, the defendants renew their challenge to Fonseca's in-court identification and also seek reversal of their conviction on Count One, the Hobbs Act charge, on the ground that the government failed to present sufficient evidence that the robbery affected interstate commerce.[1] A reversal on Count One would require reversal on the Count Two firearms charge as well because proof of the Hobbs Act violation is an element of that offense. See United States v. Jiménez-Torres, 435 F.3d 3, 8 n.1 (1st Cir. 2006).

## II. **IDENTIFICATION**

The appellants claim that the district court erred in refusing to suppress Fonseca's in-court identification, which they assert was tainted by his impermissibly suggestive pre-trial encounters with them shortly after the robbery occurred. As described above, Fonseca came into contact with the defendants three or four times before the preliminary hearing that took place on the day of the robbery. It is undisputed that he saw them at the mall shortly after they were arrested and handcuffed, although the precise nature of that encounter was the subject of

---

[1]The Hobbs Act provides that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion . . . shall be fined . . . or imprisoned . . . ." 18 U.S.C. § 1951(a).

inconsistent testimony.[2]

There also is no dispute that the subsequent encounters were unplanned: first, at the Caguas police station, when the defendants were in a holding cell; next, according to Officer Soto, as the defendants were being transported in a police car to the courthouse; and, finally, in a holding cell near the district attorney's office at the courthouse.

Although introduction of "impermissibly suggestive" identification evidence may violate the Due Process Clause, see Neil v. Biggers, 409 U.S. 188, 196-98 (1972); United States v. Holliday, 457 F.3d 121, 125 (1st Cir. 2006), we have stated repeatedly that identification evidence should be withheld from the jury "only in extraordinary cases." Holliday, 457 F.3d at 125; United States v. Henderson, 320 F.3d 92, 100 (1st Cir. 2003); United States v. Watson, 76 F.3d 4, 6 (1st Cir. 1996). A court should suppress identifications made before trial and in the courtroom on due process grounds only if it is "persuaded that there was a very substantial likelihood of irreparable misidentification." United States v. de Jesus-Rios, 990 F.2d 672, 677 (1st Cir. 1993) (citations and quotation marks omitted); see also, e.g., Holliday, 457 F.3d at 125; Henderson, 320 F.3d at 100.

A two-step analysis is used to determine whether suppression is appropriate. Holliday, 457 F.3d at 125; Henderson,

---

[2]Fonseca testified that Officer Martínez showed him the defendants and asked if "these were the ones," while Martínez testified that he did not speak to Fonseca and that Fonseca, when he saw the defendants, volunteered that they "'are the individuals that robbed me.'"

320 F.3d at 100. We consider first whether an impermissibly suggestive identification procedure was used and, if so, whether the identification was nonetheless reliable under the totality of the circumstances. Id. Our review of the court's ruling on the motion to suppress is plenary. Henderson, 320 F.3d at 99. We review findings of fact for clear error. United States v. Brennick, 405 F.3d 96, 99-100 (1st Cir. 2005). In the end, we will affirm a district court's denial of a suppression motion if any reasonable view of the evidence supports the evidence. United States v. St. Pierre, 488 F.3d 76, 79 (1st Cir. 2007).

The identification issue first arose at the conclusion of Fonseca's testimony, during which defense counsel apparently learned for the first time that Fonseca had had four encounters with the defendants after the robbery. Counsel moved to suppress the identification. The court deferred ruling until after the government completed its case-in-chief, and when he restated the motion, counsel referred to the two-step inquiry set out above, recounted Fonseca's several encounters with the defendants on the day of the robbery, and argued that Fonseca's identification was unreliable because it lacked several indicia upon which courts usually rely.[3] The district court denied the motion, and instead announced its intention to specially instruct the jury on the

---

[3]Defense counsel noted "[T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, accuracy and level of certainty, et cetera, the length of time of the time of confrontation . . . ."

identification issue.[4]  The court later provided the following

instruction:

> In any criminal case, the government must prove, of course, that the identity of the persons who committed the alleged crime, when a person's a defendant, as the person who committed the crime . . . .
> Again, I suggest that you ask yourself a number of questions:  Did the witness have an adequate opportunity at the time of the crime to observe the person in question?  What was the length of time that the person or the witness had to observe the persons involved? What were the prevailing conditions at the time in terms of visibility or distance and the like?  Had the witnesses known or observed the person at earlier times?
> You may also consider the circumstances surrounding any lack of identification, including, for example, the manner in which the defendant was presented to the witnesses for identification, and the length of time that elapsed between the incident in question and the witness' identification of the defendant.
> After examining all the testimony and evidence in the case, if you have a reasonable doubt as to the identity of the defendant as the perpetrators of the offense charged, you must find the defendants not guilty.

Turning to the first step of our inquiry, we disagree

with the appellants' assertion that an impermissibly suggestive

episode occurred.  The initial encounter at the mall was no more

than a quick confirmation at the scene of the crime that the

officers had detained the correct individuals.  See Watson, 76 F.3d

---

[4]The defendants did not specifically object to the court's decision to instruct the jury, to the language of the instruction, or to testimony from Martínez and Fonseca about Fonseca's out-of-court recognition of them.  Those particulars are thus not before us on appeal, nor have the appellants raised these issues on appeal.

-10-

at 6 ("Show-ups that take place immediately after the offense has been committed may be necessary in order to avoid the mistaken apprehension of the wrong person."). Whether Martínez asked for the confirmation or whether Fonseca volunteered that he recognized the defendants does not change the nature of that exchange. Although the appellants argue that the need for an on-the-scene identification is diminished when the police already have made their probable cause determination and arrested suspects, the appellants have also sought to cast doubt on their culpability by asserting that other individuals had the opportunity to enter the mall. Thus, notwithstanding any "inherent element of suggestiveness" in such a confrontation, the quick and informal confirmation that took place here was appropriate for the circumstances. See Watson, 76 F.3d at 7 ("Here, the crime was very fresh, the police not suggestive, and had [the defendant] not been the assailant, [the victim] could easily have said so."). Fonseca's later views of the defendants undoubtedly reinforced his original impression, but they were chance encounters that had marginal significance given the identification at the scene of the crime.

Although our conclusion that no impermissibly suggestive procedures took place "eliminates appellants' due process arguments" Watson, 76 F.3d at 10, we note briefly that our review of the evidence assures us that Fonseca's in-court identification was reliable. The five factors to be considered in assessing reliability are "(1) the opportunity of the witness to view the

-11-

criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty demonstrated by the witness at the confrontation; (5) the length of time between the crime and the confrontation." Henderson, 320 F.3d at 100 (citing Neil, 409 U.S. at 199-200).

Here, Fonseca initially observed the defendants face-to-face, at a close distance, as they approached him. He testified that, during the robbery, he looked at them every time he had the chance and did so four or five times. His physical description of their appearance when he first saw them -- including the wearing of a fisherman's cap and sunglasses -- coincided with Dr. Loyola's observations. The details he recalled about the robbery, including that each had a gun, were consistent with the evidence that was later recovered in the bathroom from which the defendants exited. Although Fonseca's unquestionable nervousness caused him to fumble with the combination lock, his recollection of detail reflects attentiveness to his surroundings.

None of this evidence, which was derived from Fonseca's experiences during and in the immediate aftermath of the robbery, could have been mistakenly based on his post-robbery exposures to the defendants. Moreover, both Fonseca and Martínez testified that when Fonseca first saw the defendants after the crime -- an encounter we already have deemed permissible -- his recognition of them was immediate. Given that reaction, we are confident that the subsequent encounters had little, if any, impact on the level of

-12-

certainty of his in-court identification. Finally, as to the fifth factor, the length of time between the crime and the in-court identification, the six-month span here is de minimis compared to other cases. Cf. Henderson, 320 F.3d at 101 (upholding in-court identification despite passage of two and one-half years after crime); United States v. Flores-Rivera, 56 F.3d 319, 331 (1st Cir. 1995) (seven-year gap between crime and identification permissible where other factors were persuasive). In sum, "we cannot say that under all the circumstances of this case there is a very substantial likelihood of irreparable misidentification. Short of that point, such evidence is for the jury to weigh." Manson v. Brathwaite, 432 U.S. 98, 114 (1977), quoted by Henderson, 320 F.3d at 100. We therefore find no error in the district court's denial of the appellants' motion to suppress Fonseca's identification testimony.

### III. THE HOBBS ACT

The appellants make two arguments related to the Hobbs Act.[5] First, they contend that their convictions on Counts One and Two must be reversed because the government failed to introduce sufficient evidence that their robbery of the lottery business affected interstate commerce within the meaning of the Hobbs Act. The evidence was insufficient, in their view, because the

---

[5]As noted earlier, Count One explicitly charged a Hobbs Act violation, while the firearms charge in Count Two is premised on the use of a firearm in connection with that crime. See 18 U.S.C. § 924(c)(1)(A) (providing enhanced penalty when a firearm is used "during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States").

government failed to prove that the lottery business was engaged in interstate commerce.[6] Second, the appellants contend that the district court improperly instructed the jury on the Hobbs Act charge. Because neither of the appellants' preserved these claims below, we review both for plain error.[7] United States v. Griffin, 524 F.3d 71, 76 (1st Cir. 2008). Accordingly, appellants must show

---

[6]Arguably, the appellants have waived the argument that the government failed to produce sufficient evidence that the lottery business was engaged in interstate commerce. In their opening briefs, the appellants appear to concede that the lottery business was engaged in interstate commerce and focus instead on the prosecution's "burden to prove the impact" of the robbery on interstate commerce. The appellants both argue "[u]nlike statutes that make it a federal offense to possess a[] weapon that has at one time traveled in interstate commerce, the Hobbs Act requires some proof of impact. It was totally lacking here." In their reply briefs, however, the appellants switch gears. That the robbery had a "de minimis impact" on interstate commerce, the appellants observe, "is not in dispute here." Rather, the appellants contend that at issue "is the adequacy of the proof that [the lottery business] was, in fact, engaged in interstate commerce, rather than the adequacy of the proof of impact."
We have made clear that arguments that make their debut in a reply brief are deemed waived. United States v. Vanvliet, 542 F.3d 259, 264 (1st Cir. 2008) (citing United States v. Marti-Lon, 524 F.3d 295, 299 n.2 (1st Cir. 2008)). Nevertheless, because the waiver issue is a close one, we will address the appellants' argument on the merits.

[7]We note that although the appellants did move for a judgment of acquittal under Rule 29 at the close of the government's case, neither did so on the basis that the government failed to present sufficient evidence that the lottery business was engaged in interstate commerce. Rather, counsel for the appellants contended that "there is insufficient evidence for the robbery, [and] the firearm." See United States v. Upham, 168 F.3d 532, 537 (1st Cir. 1999) (applying plain error standard or review because although "[appellant] did move for a judgment of acquittal [he] did not raise this [particular] request or objection"); see also United States v. Pena-Lora, 225 F.3d 17, 26 & n. 5 (1st Cir. 2000) (citing United States v. Dandy, 998 F.2d 1344, 1356-57 (6th Cir. 1993)). The district court denied the Rule 29 motion, commenting that "[T]here is overwhelming evidence of the fact that this robbery took place as testified to by the witnesses."

-14-

an error that was plain, (i.e., obvious and clear under current law), prejudicial (i.e., affected the outcome of the district court proceedings), and that seriously impaired the fairness, integrity, or public reputation of the judicial proceedings.  Id.

## A.  Sufficiency claim

To successfully prove the robbery violated the Hobbs Act, the government had to demonstrate that the robbery had an effect on interstate commerce.  Jiménez-Torres, 435 F.3d at 7.  The effect need not be significant.  It is well established that "a de minimis interference with commerce is enough to sustain a Hobbs Act conviction."  United States v. Cruz-Arroyo, 461 F.3d 69, 75 (1st Cir. 2007); United States v. Capozzi, 347 F.3d 327, 335 (1st Cir. 2003) ("[T]o prove a Hobbs Act violation, the government must show only that the . . . conduct created 'a realistic probability of a de minimis effect on interstate commerce.'") (quoting United States v. Butt, 955 F.2d 77, 80 n.2 (1st Cir. 1992)).[8]

Where a business[9] has been robbed, the government may demonstrate the robbery affected interstate commerce by

_____

[8]That such a minimal effect on interstate commerce implicates the Hobbs Act reflects the statute's broad sweep.  Congress, in passing the Act, intended "'to use all [its] constitutional power . . . to punish interference with interstate commerce by extortion, robbery, or physical force.'"  Jiménez-Torres, 435 F.3d at 7 (quoting Stirone v. United States, 361 U.S. 212, 215 (1960)).

[9]We have noted that criminal acts directed at businesses have a more obvious effect on interstate commerce than criminal acts directed at individuals.  See United States v. Rodriguez-Casiano, 425 F.3d 12, 15 (1st Cir. 2005) (citing United States v. McCormack, 371 F.3d 22, 28-29 (1st Cir. 2004)); see also United States v. Quigley, 53 F.3d 909, 910 (8th Cir. 1995) ("Actions normally have a lesser effect on interstate commerce when directed at individuals rather than businesses.") (citations omitted).

demonstrating that (1) the business engaged in interstate commerce, and (2) that the robbery either depleted the assets of the business, United States v. Rodríguez-Casiano, 425 F.3d 12, 15 (1st Cir. 2005), or resulted in the business's temporary or permanent closure. United States v. Cruz-Rivera, 357 F.3d 10, 14 (1st Cir. 2004) (expressing doubt "that there is any serious claim of a constitutionally insufficient interstate commerce connection where a robbery directly results in the shutting down of an interstate business"). Here, there is no dispute about the asset depletion or closure because the lottery business was robbed of nearly $9,000 and it remained closed on the day of the robbery. The focus, then, is on whether the lottery business was engaged in interstate commerce.

Previously, we have held that a business is engaged in interstate commerce where the business purchased products from out-of-state. In Jiménez-Torres, we concluded that a gas station was involved in interstate commerce where, in the two months preceding robbery, the station had purchased a substantial amount of gasoline from outside of Puerto Rico. 435 F.3d at 8. In United States v. Cruz-Arroyo, we concluded that the interstate commerce nexus was satisfied in an extortion case where money paid to the defendant was traceable to a Puerto Rico hospital that bought much of its equipment from the United States. 461 F.3d 69, 76 (1st Cir. 2006). And finally, in Capozzi we concluded that evidence that a car dealer purchased vehicles from out of state was sufficient to establish the interstate commerce nexus. 347 F.3d at 337.

-16-

Other cases establish that where a business serves out-of-state customers, the business is engaged in interstate commerce. For example, in United States v. Rodriquez, 218 F.3d 1243, 1244 (11th Cir. 2000), the Eleventh Circuit affirmed the defendant's conviction under the Hobbs Act for robbing five motels. The Court noted that the evidence presented established that all of the motels robbed by the defendants registered guests from out-of-state and that at least four registered guests from outside the country. Id. at 1244. In holding that the robbery of the motels constituted a Hobbs Act violation, the court concluded that "evidence that [motels] have at some point registered guests from out-of-state is sufficient to establish their connection to interstate commerce." Id. at 1245; see also United States v. Pearson, 508 F.2d 595, 596-97 (5th Cir. 1975) (holding that the government's evidence, consisting of 1,000 guest registration cards from a large hotel, was sufficient to establish that the defendant robbed a hotel that was engaged in interstate commerce). And in Capozzi, we concluded that one of the robbery victims was engaged in an "interstate drug business" because he sold drugs repeatedly to out-of-state customers. 486 F.3d at 726.

Here, the government introduced evidence that the lottery business purchased goods from out of state and that the business served tourists. The evidence with respect to the former consisted of both a stipulation and testimony from Muñiz. The stipulation established that the Muñiz Gallery used lottery machines that had been manufactured in Rhode Island. The stipulation provided:

That Mr. Pedro Zayas is the local representative of GTEC Corporation. Mr. Zayas would testify that, pursuant to a professional service agreement between the Department of the Treasury of the Commonwealth of Puerto Rico and GTEC Latin American Corporation, which is a subsidiary of GTEC Corporation, a lottery terminal including of the type they usually use was installed at the business of Mr. Muñiz on October 11, 2004, so that he could sell online lottery, loteria electronica, out of that business.

Mr. Zayas would also testify that this machine was manufactured in Rhode Island and from there was shipped to Puerto Rico for installation here.

Muñiz further testified that the lottery machines and "all of the parts and cables and everything . . . they come from the States . . . . And the screens, the cables, the whole of the inside of the game, I bring it from outside."

With respect to the lottery business's involvement in tourism, Muñiz testified that the lottery business' customers included tourists from outside of Puerto Rico.[10]

Even if we were reviewing the appellants' sufficiency claim de novo,[11] which we are not, we would be hard pressed to find the evidence regarding the interstate commerce nexus insufficient

---

[10]At trial, Muñiz was specifically asked, "Do you ever receive clientele from outside of Puerto Rico?" He responded: "Yes, when tourists come. People who live in the United States and they know the business where the lottery tickets are sold, and they play in the gaming room."

[11]When reviewing a sufficiency claim de novo, "we examine the evidence, both direct and circumstantial, in the light most favorable to the prosecution and decide whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime." United States v. Cruz-Rodriguez, 541 F.3d 19, 26 (1st Cir. 2008).

-18-

to support the verdict. Both the stipulation and Muñiz's testimony established that the lottery machines put out of service by the robbery, as well as associated equipment, were interstate purchases. See Jiménez-Torres, 435 F.3d at 8. In addition, Muñiz's testimony that he "bring[s] [the equipment] from outside" is sufficient to allow a jury to infer that he also purchased equipment ancillary to the machines in the past and could do so in the future. The jury's verdict also finds support in the fact that at least some lottery customers were from the United States. See Rodriguez, 218 F.3d at 1244. In sum, given the evidence adduced at trial, the appellants' sufficiency claim cannot survive plain error review.

The appellants, for their part, contend that the government failed to present sufficient evidence that the lottery business was engaged in interstate commerce. They appear to make two arguments.

Their first argument is that the lottery business had to be "regularly engaged in buying and selling products [] manufactured outside of Puerto Rico" in order to be engaged in interstate commerce. In support of this argument, the appellants cite Jiménez-Torres, 435 F.3d at 8 and United States v. Vega Molina, 407 F.3d 511, 527 (1st Cir. 2005). In those cases, the appellants maintain, the businesses at issue regularly bought and sold out-of-state goods. Although the appellants never make the point explicitly, they appear to suggest that the lottery business's purchase of machines from Rhode Island was a one-off

-19-

event and that, as a result, the business was not "regularly engaged in buying and selling products." There are at least two problems with this argument.

First, even assuming that a business needs to be "regularly engaged in buying and selling [out-of-state] products" in order to be engaged in interstate commerce, the record can be fairly read to indicate that the lottery business was so engaged. As noted above, Muñiz testified that the lottery machines and "all of the parts and cables and everything . . . they come from the States . . . . And the screens, the cables, the whole of the inside of the game, I bring it from outside." If we were to read this testimony as indicating that the lottery business only dealt in interstate products one time, we would effectively be viewing the evidence in the light most favorable to the defendants. Cruz-Rodriguez, 541 F.3d. It is well established, of course, that we view the evidence in the light most favorable to the verdict. A jury would need no special background knowledge or particular evidence to infer that machines, games, screens and cables become obsolete or are broken and must be replaced. The jury could have validly inferred -- based on Muñiz's testimony -- that the lottery business was regularly engaged in interstate commerce.

Second, the appellants' argument fails to address Muñiz's testimony that some of the lottery business's customers were from out-of-state. This evidence alone suffices to establish the requisite interstate commerce nexus. See United States v. Peterson, 236 F.3d 848 (7th Cir. 2001) ("[T]ypically in Hobbs Act

-20-

cases an owner or manager of the business establishment takes the stand to testify that the business robbed <u>either</u> served out-of-state customers <u>or</u> bought inventory manufactured out-of-state.") (emphasis added) (citation omitted)).

The appellants say that it was the Puerto Rico Department of Treasury, not the lottery business, that was engaged in interstate commerce. The lottery business, they note, leased the machines from the Puerto Rico Department of Treasury.

We are unpersuaded by this argument for two reasons. First, the argument proceeds on a faulty premise -- that the lottery business' only connection to interstate commerce was the leasing of out-of-state machines from the Department of Treasury. As we have just noted, the lottery business served out-of-state customers, specifically, tourists coming from the mainland United States.

Second, a business may be engaged in interstate commerce indirectly. For example, if a business purchases its products from an in-state supplier who, in turn, purchases its products from out of state, that indirect link to interstate commerce suffices to establish that the business is engaged in interstate commerce. <u>See</u> <u>United States</u> v. <u>Zeigler</u>, 19 F.3d 486, 491 (10th Cir. 1994) ("[The business] purchased goods from an [in-state] distributor who, in turn purchased the goods it supplied to [the business] from outside the state. This indirect link to interstate commerce is sufficient to establish that [the business] was engaged in interstate commerce."). The reason why an indirect link may establish the

-21-

requisite interstate nexus is that a crime that either closes or depletes the assets of a business indirectly engaged in interstate commerce could realistically affect interstate commerce. See United States v. Elias, 285 F.3d 183, 189 (2d Cir. 2002) (rejecting defendant's argument that the government was required to show that some of the products sold by the business were purchased directly from out-of-state suppliers and holding that "a robbery of a local [business] may be said to affect interstate commerce if the robbery impairs the ability of the [business] to acquire - whether from out-of-state or in-state suppliers - goods originating out-of-state"); United States v. Brown, 959 F.2d 63, 68 (6th Cir. 1992) ("Brown attempted to rob a tavern that . . . purchased goods from local distributors who in turn purchased goods from outside of the state. Had Brown's heist been successful, there is a realistic probability that the depletion of the bar's assets would have affected the amount of its purchases of beer having moved through interstate commerce.").

## B. Jury instruction claim

Next the appellants claim that the jury was improperly instructed on the Hobbs Act charge. They focus on one sentence within the judge's charge, which stated that in order to find defendants guilty, the jury had to find that "the natural consequences" of the defendants' acts "would affect commerce in any way or in any degree." The appellants argue that the instruction improperly asked the jury to find whether their acts would affect commerce, as opposed to the correct formulation, which would have

-22-

asked whether the acts <u>did</u> affect commerce.  In the absence of an objection, we review for plain error.  <u>United States</u> v. <u>Paniagua-Ramos</u>, 251 F.3d 242, 246 (1st Cir. 2001).

In relevant part, the trial judge  stated:

> As I said before, it is against federal law to obstruct, delay, or affect commerce by committing robbery.  For you to find the defendants guilty of this crime, you must be convinced that the government has proven each of the following things beyond a reasonable doubt:
>
>  . . .
>
> Fourth, that the robbery affected commerce.
>
> It is not necessary for you to find that the defendants knew or intended that their actions would affect commerce.  It is only necessary that the natural consequences of the acts committed by the defendants as charged in the indictment would affect commerce in any way or any degree.

We reject the appellants' argument.  Contrary to their assertion, the trial judge specifically <u>did</u> instruct the jury that it had to find "that the robbery affected commerce."  Additionally, the sentence targeted by appellants, when placed in its proper context, is a correct statement of the law, wherein the government is not required to prove that the defendants intended to affect commerce.  <u>See</u> <u>Jiménez-Torres</u>, 435 F.3d at 9-10 ("Jiménez may not have intended to cause these effects, but his intent is irrelevant to establish the commerce element of a Hobbs Act offense.").  Our task is to review jury instructions as a whole, to determine if they adequately explain the law.  <u>United States</u> v. <u>Gonzalez-Velez</u>, 466 F.3d 27, 35 (1st Cir. 2006).  It is clear that this instruction

is in accord with the law.[12]   We therefore find no error in the instruction.

## IV.   SENTENCING

The district court sentenced the appellants on Counts One and Three to concurrent terms at the tops of their applicable Guidelines ranges -- 115 months for Rivera and 97 months for Sánchez.   On Count Two, the court imposed the mandatory, consecutive sentence of twenty-five years required by 18 U.S.C. § 924(c)(1)(C)(I), which applies when a defendant charged with using a firearm during a violent felony has a previous conviction for such conduct.   The indictment, however, charged a violation of § 924(c)(1)(A)(ii), which mandates a seven-year consecutive minimum sentence and is applicable when a defendant "brandishes" a firearm in furtherance of a violent crime.   The Presentence Investigation Reports ("PSRs") originally recommended the seven-year term, but, in response to a government objection, the PSRs were amended to take the 1998 bank robbery into account.   The amended PSRs thus proposed the mandatory twenty-five year term for Count Two.   At sentencing, as they do on appeal, the defendants objected to the change, asserting that the prior conviction should be viewed as an element of the § 924(c) violation and thus a fact the jury needed to find beyond a reasonable doubt.   The trial court rejected their argument, concluding that the twenty-five year term was a

---

[12]While the instruction also follows verbatim the First Circuit's Pattern Jury Instructions, See First Circuit Criminal Pattern Jury Instructions § 4.16 (1998), these are only a guide, and not mandated by this court. United States v. Tse, 375 F.3d 148, 157-58 (1st Cir. 2004).

sentencing enhancement that properly could be imposed by the court.[13]  In addition, the appellants argue that various Guidelines enhancements were impermissibly factored into the sentence on Counts One and Three based on facts not found by the jury, and that the district court failed to abide by 18 U.S.C. § 3553(a)'s call that a sentence must be "sufficient, but not greater than necessary" to achieve the objectives of sentencing.

We turn first to the 25-year consecutive sentence imposed on Count Two, pursuant to 18 U.S.C. 924(c)(1)(C)(I), which mandates a minimum sentence of twenty five years "[i]n the case of a second or subsequent conviction under this subsection . . . ."  We agree with the district court's conclusion that this is a sentencing enhancement, rather than an element of the offense, and thus a jury determination on the "second or subsequent conviction" issue was not required.  Although we have not passed on this particular

---

[13]An extended colloquy took place at Rivera's sentencing concerning the need for the jury to hear evidence of the prior conviction with respect to both Count Three, the felon-in-possession charge, and to the harsher penalty on Count Two.  The court noted that the defendants had stipulated to the fact of a prior conviction for purposes of Count Three.  Rivera's counsel acknowledged the stipulation, but asserted that the fact of the stipulation was never presented to the jury, and the jury thus lacked evidence on a crucial element of the charge.  The court, however, understood the stipulation to remove the prior conviction from the case, allowing the jury to decide only whether defendants had possessed firearms.  If the jury found possession, the court's view was that the stipulation would kick in to complete the evidence necessary to support a guilty verdict on Count Three.  With respect to the twenty-five year term imposed on Count Two – which was based on the same prior conviction – the court ultimately ruled that the penalty was "an appropriate sentencing enhancement under the circumstances."  Both appellants explicitly declaim any challenge to that portion of the sentence on Counts One and Three that resulted from the stipulation.

subsection, we agree with the Second Circuit's conclusion that the fact of a prior conviction is not an element of § 924(c). United States v. Mejia, 545 F.3d 179, 207-08 (2d Cir. 2008)(citing United States v. Campbell, 300 F.3d at 202, 212-13 (2d Cir. 2002).[14] We further note that this conclusion is in harmony with our construction of the mandatory minimum sentence provision of the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1), which is routinely considered an enhancement suitable for judicial determination. See, e.g., United States v. Diaz, 519 F.3d 56, 66-67 (1st Cir. 2008); United States v. Lewis, 406 F.3d 11, 21 n.11 (1st Cir. 2005).

With that question resolved, the sentence at issue falls squarely within the realm of Apprendi v. New Jersey, 530 U.S. 466 (2000), in which the Supreme Court held that prior convictions were not among the sentence-enhancers that must be submitted to a jury and proved beyond a reasonable doubt. Id. at 490; see also Campbell, 300 F.3d at 212-13. In so doing, the Court left undisturbed that portion of Almendarez-Torres v. United States, 523 U.S. 226 (1998), which treated prior convictions as sentencing factors, rather than offense elements. Although appellants point

---

[14]In analyzing a provision relating to machine guns, § 924(c)(1)(B)(ii), we recently concluded that knowing possession of a machine gun is an element of the crime that must be proven to the jury. United States v. O'Brien, 542 F.3d 921 (1st Cir. 2008). In this case, however, the appellants do not make any allegations regarding the possession of a machine gun. Rather they challenge the fact of a prior conviction, which as we further explain infra, the Supreme Court definitively has concluded is a sentencing enhancement that need not be proven to a jury. See Almanderes-Torres v. United States, 523 U.S. 226 (1998).

to Justice Thomas's concurring opinion in Shepard v. United States, 544 U.S. 13 (2005) that questioned the continuing viability of Almendarez-Torres, "[w]e have ruled with a regularity bordering on the monotonous, that given the explicit exception and force of Almendarez-Torres, the rationale of Apprendi does not apply to sentence-enhancement provisions based upon prior criminal convictions." United States v. Ivery, 427 F.3d 69, 74-75 (1st Cir. 2005)(internal quotations and citations omitted).

Here, the district court had before it the appellants' generalized stipulation that they had previously been convicted of a felony punishable by more than one year as well as the PSRs which specifically noted that the appellants had previously pled guilty to using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §924(c)(1). The appellants attempt to shrug off the yoke of Apprendi, Almendarez-Torres, and Mejia by arguing that Shepard limits the district court's consideration to a charging document, written plea agreement or plea colloquy. We disagree. Shepard involved a determination whether certain predicate offenses were "crimes of violence," within the meaning of the ACCA. Given the factual inquiry involved, the Court limited the type of fact-finding that could be permissibly conducted by the trial judge. Shepard, 544 U.S. at 24-26. Here, by contrast, the district court needed only to find that the prior convictions were under section 924(c), a fact which was both undisputed by the

defendants[15] and readily apparent from the PSR.  Cf. United States v. Brown, 510 F.3d 57, 74-75 (1st Cir. 2007) (district court may not rely solely on factual assertions in PSR if defendant contests them).  Accordingly, we find no error in the district court's application of 18 U.S.C. § 924 (c)(1)(C)(i) to Count Two.

Finally, we address the appellants' contention that the district court failed to comply with 18 U.S.C. § 3553(a).  In sentencing appellants on Counts One and Three, which were properly grouped for sentencing, the district court was bound to employ the procedures we sketched out in United States v. Jimenez-Beltre, 440 F.3d 514 (1st Cir. 2006) by "engag[ing] in a sequential determination of the guideline range, including any proposed departures, followed by the further determination whether other factors identified by either side warrant an ultimate sentence above or below the guideline range."  Id. at 518-19.  The court also must consider the sentencing factors set forth in 18 U.S.C. § 3553(a) and ultimately explain the reasoning behind the sentence, even if the sentence is within the guideline range.  United States v. Turbides-Leonardo, 468 F.3d 34, 40-41 (1st Cir. 2006).  We review the district court's interpretation of the Guidelines de novo, and its factual findings for clear error.  United States v. Alli, 444 F.3d 34, 37 (1st Cir. 2006).

With respect to Sánchez, the district court, following the PSR, started with a base offense level of 20. U.S. Sentencing

---

[15]The appellants disputed many aspects of the PSR, but neither one disputed that his predicate conviction was, in fact, for violating 18 U.S.C. § 924(c).

Guideline Manual § 2B3.1 (2004). Upward adjustments were added for physical restraint of the victim (two points), making a death threat (two points), theft of a firearm (one point), and loss in excess of $10,000 (one point). The resulting adjusted offense level was 26. Sánchez was assigned three criminal history points for his prior conviction, two because the subject offense occurred while he was on parole, and one because it occurred less than two years after his release from prison. The six points placed Sánchez in Criminal History Category III, resulting in an advisory Guideline range of 78 to 97 months. The district court imposed a sentence at the top of that range, 97 months. Adding the 25-year consecutive sentence from Count Two, Sánchez's sentence totaled 397 months.

Rivera's sentencing calculation was different in only one respect. His record included an additional conviction which led to seven criminal history points, placing him in Criminal History Category IV, and yielding a guideline range of 92 to 115 months. The court again chose the uppermost sentence within the range, which, when combined with the 25-year sentence on Count Two, yielded a sentence of 415 months.

As the appellants advance identical arguments, we treat them together. First, relying on Apprendi, they argue that the enhancements to their respective base offense levels needed to be determined by a jury, beyond a reasonable doubt. We have previously held, however, that Apprendi does not prohibit a sentencing court from making factual findings that increase a

defendant's sentence as long as the sentence imposed is within the default statutory maximum based on the jury's findings. United States v. Butterworth, 511 F.3d 71, 77 (1st Cir. 200). Here, the statutory maximum sentences on Counts One and Three are 20 and 10 years, respectively. See 18 U.S.C. §§ 1951(a) and 924(a)(2). Thus, the court properly considered these enhancements.

Next the appellants each argue that the court erroneously concluded that there was a total loss in excess of $10,000, as required by U.S. Sentencing Guidelines Manual § 2B3.1(b)(7) (2004). We disagree. In addition to the undisputed fact that $8700 was stolen from Muniz, testimony also supported the finding that a watch and gold key ring were taken, thus bringing the total loss to over $10,000. It is of no moment that the items were recovered and returned. See Id. § 2B3.1(7) ("loss" is defined as the value of the property taken); see also United States v. Cruz-Santiago, 12 F.3d 1, 3 (1st Cir. 1993) (in larceny case, finding that permanent and temporary takings are treated similarly for Guidelines purposes). Accordingly, we find that the one-point enhancement for a loss exceeding $10,000 was proper.

The appellants' final argument is that the district court violated the principles of Booker by failing to consider the factors contained in 18 U.S.C. § 3553(a), and thus effectively treated the Guidelines as mandatory. Tied to this specific argument is their claim that their sentences -- 415 months for Rivera and 397 months for Sanchez -- violated both section 3553(a)'s language that sentences be "sufficient, but not greater

than necessary" and the "ultimate requirement of reasonableness." Jimenez-Beltre, 440 F.3d at 518. We disagree.

We first note that the district court explicitly indicated that the Guidelines were advisory during each appellant's sentencing hearing. Next, as we have done in the past, we reject the appellants' argument that section 3553(a)'s "sufficient, but not greater than necessary" language is a mandate for leniency. This language "is often cited by defendants as if it were an admonition to be lenient (and to explain a lack of leniency)." United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006). However, "we do not think that the 'not greater than necessary' language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate." Id. Here, the district judge explained that the Guideline portion of Sánchez's sentence was based in part on the fact that the instant crime was his second armed robbery, that it was committed while on supervised release, and that he has shown a violent and criminal behavior toward society while lacking respect for the criminal justice system. The trial court explained Rivera's sentence in similar terms.

In our view, these explanations are sufficient to satisfy section 3553(a). This is not a situation where, for example, "the district judge gave a one-sentence explanation" of the sentence, without explaining the Guidelines calculations or referencing any evidence that influenced the decision. See, e.g., United States v. Garcia-Carasquillo, 483 F.3d 124, 132 (1st Cir. 2007) (remanding

-31-

for re-sentencing due to district court's inadequate sentence explanation).[16]  We find no sentencing error.

## V.  <u>CONCLUSION</u>

The convictions and sentences are **<u>affirmed</u>**.



**"Dissenting Opinion follows"**

---

[16]We note that the trial court is not required to state the reasoning for imposing sentence at a particular point in the guideline range, as neither appellant's range exceeded 24 months. 18 U.S.C. § 3553(c); <u>Navedo-Concepcion</u>, 450 F.3d at 56.

**LIPEZ**, **Circuit Judge**, dissenting in part. I respectfully disagree with the majority's conclusion that the evidence in this case was sufficient to allow the jury to find that appellants' robbery affected interstate commerce within the meaning of the Hobbs Act. The interstate commerce element of the statute serves the important function of establishing a federal interest in crimes that are typically the concern of state criminal law, and it is thus a critical component of a Hobbs Act violation. Although I recognize that "a de minimis effect" will suffice to meet the commerce element," United States v. Capozzi, 347 F.3d 327, 335 (1st Cir. 2003), the evidence here falls short of even that modest requirement. I therefore would reverse appellants' convictions on Counts One and Two.[17]

---

[17]As the majority notes, the defendants did not specifically refer to the interstate commerce element in making their Rule 29 motion. The district court did not give them the opportunity to do so. After the court ended a discussion concerning pretrial identification by saying that it would give the jury a specific instruction on identification procedures, the colloquy continued as follows:

> DEFENSE COUNSEL: Other than that, we pray the Court to grant a Rule 29 and enter a not guilty verdict on this particular case at this time, because I submit that there is insufficient evidence for the robbery, the firearm, and the fact –
> COURT: I think there is overwhelming evidence of the fact that this robbery took place as testified to by the witnesses. Motion denied.
> OTHER DEFENSE COUNSEL: We adopt the motion.
> COURT: Anything else?
> GOVERNMENT: [returning to identification issue]

In these circumstances, I would not apply plain error review. In any event, I believe the government's failure to prove the interstate commerce element constitutes plain error.

-33-

There is no doubt that the lottery business was impacted in ways that would establish an effect on interstate commerce if the business were regularly involved in such commerce. As the majority notes, the interstate commerce element of the Hobbs Act is often proven in a robbery case by showing that the crime depleted the assets of a business engaged in interstate commerce, see United States v. Rodríguez-Casiano, 425 F.3d 12, 15 (1st Cir. 2005), or forced such a business to close, even temporarily, see United States v. Cruz-Rivera, 357 F.3d 10, 14 (1st Cir. 2004). Either of those situations potentially affects the company's ability to conduct business as usual, thereby "creat[ing] 'a realistic probability'" of preventing transactions in interstate commerce. Capozzi, 347 F.3d at 335 ("[T]he government must show only that the . . . conduct created 'a realistic probability of a de minimis effect on interstate commerce.'" (quoting United States v. Butt, 955 F.2d 77, 80 n.2 (1st Cir. 1992))); see also United States v. DeCologero, 530 F.3d 36, 68 (1st Cir. 2008). I thus agree with the majority that the lottery business's closure for a day and its loss of $9,000 would cause the kind of impact required by our cases.[18]

_____

[18]The government has long prosecuted Hobbs Act cases in Puerto Rico assuming that it must prove an impact on interstate commerce rather than on commerce within the Commonwealth. In response to the panel's request for supplemental briefing, the government now argues that the interstate commerce requirement applies only to crimes that occur in the fifty states and not to those committed in other United States jurisdictions. See United States v. Liburd, 291 F. Supp. 2d 383, 385-86 (D.V.I. 2003) (holding the requirement inapplicable to territories or possessions). It relies on the Act's definition of "commerce" as including "commerce within . . . any Territory or Possession of the United States." 18 U.S.C. § 1951(b)(3).

However, as the government points out, even if the full panel

-34-

My problem is that the evidence did not show the necessary involvement by the business in interstate commerce. To be sure, Muñiz's enterprise used equipment – the lottery and gaming machines – that were manufactured outside Puerto Rico. Missing from the record, however, is any indication of future transactions in interstate commerce. There was no evidence that Muñiz purchased machines for the business regularly or planned to acquire one at any point in the foreseeable future.[19] Nor was there evidence that the business engaged in any other interstate transactions in the ordinary course of its business. Although it seems plausible that the paper used in printing lottery tickets might come from outside Puerto Rico and that the supply might need regular replenishing, or that Muñiz might have had a maintenance contract with the Rhode Island manufacturer to regularly service his machines, no evidence

---

agreed that it is unnecessary to prove an effect on interstate commerce for Hobbs Act violations in Puerto Rico, that construction of the statute would be inapplicable in this case because the charges were brought, and the jury was instructed, based on the interstate commerce requirement. See McCormick v. United States, 500 U.S. 257, 270 n.8 (1991) ("Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury."); Chiarella v. United States, 445 U.S. 222, 236 (1980) ("[W]e cannot affirm a criminal conviction on the basis of a theory not presented to the jury."). Thus, even if I accepted the government's new understanding of the Hobbs Act as it applies to Puerto Rico, it would not affect my view of the sufficiency of the evidence in this case. I therefore do not discuss the merits of that argument.

[19]Indeed, the evidence suggests that Muñiz did not even purchase the lottery machines himself, but obtained them from the Commonwealth's Department of the Treasury, which brought them to Puerto Rico through an arrangement with the manufacturer. Because I believe the interstate commerce element would not be satisfied even if Muñiz had purchased the machines himself, I need not dwell on this further complication.

of such dealings was presented. Thus, the record lacks proof of future interstate purchasing by Muñiz's business on which the robbery could have had an impact.[20]

The majority asserts that it is reasonable to infer that the lottery business was engaged in ongoing interstate commerce because "[a] jury would need no special background knowledge or particular evidence to infer that machines, games, screens and cables become obsolete or are broken and must be replaced." It cites Muñiz's testimony that all of the equipment associated with the machines – "the screens, the cables, the whole of the inside of the game" – came from the United States mainland. But the Hobbs Act requires proof that this particular robbery potentially impeded the business's interstate dealings, see Capozzi, 347 F.3d at 336 ("[T]he Hobbs Act 'ensure[s], through case-by-case inquiry, that the [extortion or robbery] in question affects interstate commerce.'") (quoting United States v. Lopez, 514 U.S. 549, 561 (1995)), and the possible purchase of replacement equipment at some undefined point in the future does not suffice to establish that nexus. Neither the business's closure for a day nor its loss of cash proceeds can reasonably be presumed to affect a transaction that may not occur for years.

_____

[20]I note my agreement with the majority that the interstate commerce element would be satisfied if a business purchased its inventory from an in-state supplier that obtained the products from out of state. Such interstate activity, although indirect, is nonetheless ongoing, and a robbery of the business would have the same impact on the future purchase of out-of-state goods as it would if the products were purchased directly from an out-of-state source.

The majority contends that reading Muñiz's testimony to indicate that his business "only dealt in interstate products one time" would be to view the evidence in the light most favorable to the defendants, contrary to our obligation to view the testimony in the light most favorable to the verdict. I am not suggesting, however, that the jury could not reasonably infer that Muñiz <u>at some point</u> would make additional purchases of machines and parts, but only that the record contains no evidence of the frequency of such purchases or whether any such transaction was anticipated in reasonable proximity to the robbery. In the absence of such evidence, it would be rank speculation for the jury to find that this robbery had an impact on interstate commerce.

In relying on the lottery business's past acquisition of equipment, without any evidence of future purchases, the majority takes a significant step beyond the precedent it invokes. Implicit in the cases is a requirement that the victim company's interstate activity occur in the regular course of its business, such as when a firm's stock in trade is a product acquired from an out-of-state supplier or when, as in the case of a hotel, the business by its nature depends on out-of-state customers. <u>See</u>, <u>e.g.</u>, <u>United States v. Jiménez-Torres</u>, 435 F.3d 3, 8 (1st Cir. 2006) (Puerto Rico gas station purchased gasoline from a refinery in the Virgin Islands); <u>Rodriguez-Casiano</u>, 425 F.3d at 14 (Puerto Rico businesses obtained much of their inventory from mainland suppliers); <u>United States</u> v. <u>Hemingway</u>, 108 Fed. App'x 83, 85 (4th Cir. 2004) (noting that victim hotel was part of a national chain that received supplies

from out-of-state and that most of the hotel's guests were from out-of-state); Capozzi, 347 F.3d at 337 (car dealership that bought cars from out-of-state); United States v. Rodriquez, 218 F.3d 1243, 1244 (11th Cir. 2000) (per curiam) (robbery of motels); United States v. Pearson, 508 F.2d 595, 596-97 (5th Cir. 1975) (per curiam) (robbery of a hotel). This requirement makes sense. Where the robbed establishment engages in interstate commerce on a regular basis, an interstate impact can be presumed from the mere fact that the crime occurred.

Thus, the majority misses what I see as a clear distinction between businesses whose merchandise or supplies include products regularly obtained by means of interstate commerce, requiring repeated future transactions to replenish inventory, and businesses whose only connection with interstate commerce was the initial purchase of the materials or equipment needed to set up the company. A robbery of the latter type of business would potentially affect interstate commerce only coincidentally, i.e., if a purchase of replacement equipment happened to be imminent. When a business is involved in interstate commerce every day, however, there is a "realistic probability" that any depletion of assets or forced closure would have an effect on interstate commerce. See, e.g., United States v. Hebert, 131 F.3d 514, 523 n.8 (5th Cir. 1997) ("[A] showing that the business regularly buys goods from out of state allows an inference that the robbery will impair a future purchase.").

-38-

The majority alternatively points to evidence that the lottery business served tourists from out-of-state, relying on cases involving motels and hotels to assert that evidence of past out-of-state customers is enough of a nexus to interstate commerce to satisfy the statutory requirement. The hotel context is not, however, equivalent to the circumstances in this case. The hotel industry focuses on attracting travelers from outside the local area, and out-of-state tourists routinely book hotel or motel accommodations from their home locations. In effect, out-of-state guests are part of the "stock in trade" of a hotel business, and many of those guests' interactions with the hotel can reasonably be presumed to occur across state lines. In addition, hotels routinely advertise their accommodations to residents of other states. Thus, when the evidence shows that a hotel serves out-of-state guests, a jury reasonably may infer that the business is engaged in activities that implicate interstate commerce on a regular basis, and there is a "realistic probability" that any depletion of its assets would affect that commerce.[21]

---

[21]The majority quotes the Eleventh Circuit's statement in Rodriguez that evidence that the victim motels had "at some point" registered out-of-state guests was enough to establish a connection to interstate commerce. I do not understand that decision to endorse a Hobbs Act conviction where the robbed business had only a past relationship with interstate commerce. Rather, the fact that the motel had previously served out-of-state guests allowed the inference that its customary operations included such customers. In other words, a jury reasonably could find based on its clientele that the motel was regularly engaged in transactions involving interstate commerce. See also Pearson, 508 F.2d at 597 (noting that "[t]he evidence established that this hotel entertained a large number of out of state visitors, thus establishing the required interstate nexus").

By contrast, there is no evidence in this case permitting an inference that Muñiz's sale of lottery tickets to tourists ordinarily involved interstate commerce, nor any evidence of "'a realistic probability'" that interstate commerce was affected by the robbery at issue here. See Capozzi, 347 F.3d at 335. A sale of locally produced merchandise (here, the lottery ticket) does not become an interstate transaction simply because the purchaser, who is buying locally, happens to hail from out-of-state.

I recognize that, in enacting the Hobbs Act, Congress intended "'to use all [its] constitutional power . . . to punish interference with interstate commerce by extortion, robbery, or physical force.'" Jiménez-Torres, 435 F.3d at 7 (quoting Stirone v. United States, 361 U.S. 212, 215 (1960)). At the same time, however, the Supreme Court's discussions of the Commerce Clause in United States v. Lopez, 514 U.S. 549 (1995), and United States v. Morrison, 529 U.S. 598 (2000), should give us pause before further expanding its reach into traditionally local concerns. Indeed, the Court in Morrison explicitly recognized the singular role of the states with respect to violent crime: "[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." Morrison, 529 U.S. at 618; see also Lopez, 514 U.S. at 557 (noting that "the scope of the interstate commerce power 'must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote

-40-

that to embrace them . . . . would effectually obliterate the distinction between what is national and what is local'") (citation omitted).

In Capozzi, 347 F.3d at 335-36, we concluded that Lopez and Morrison did not invalidate the de minimis effect standard for Hobbs Act violations and replace it with a "substantially affects" test because – unlike the statutes at issue in those cases – the Hobbs Act includes a jurisdictional element that "'ensure[s], through case-by-case inquiry, that the [extortion or robbery] in question affects interstate commerce.'" Id. at 336 (quoting Lopez, 514 U.S. at 561). We observed that "Congress' inclusion of a jurisdictional element in the Hobbs Act addresses the Lopez Court's constitutional concern that congressional authority under the Commerce Clause not become a 'general police power of the sort retained by the States.'" Id. (quoting Lopez, 514 U.S. at 567).

The Supreme Court arguably distinguished crimes with a jurisdictional element from the statutes it invalidated in Lopez and Morrison because the interstate commerce element ensures the presence of a federal interest – justifying federal prosecution – in offenses that otherwise replicate traditional state crimes. Although we concluded in Capozzi that the "de minimis effect" standard continues to be sufficient to identify the federal interest, that standard cannot be applied so loosely that the interstate commerce element no longer serves to distinguish between federal and state crimes. Otherwise, we risk turning every routine

robbery into a federal offense.  See <u>Jiménez-Torres</u>, 435 F.3d at 14-15 (Torruella, J., concurring).

In my view, that is what the majority has done here with a de minimis effect analysis that reduces this concept to a meaningless verbal incantation.  Indeed, virtually every business uses some item that was made in another state – perhaps a table or a rug or paint on the walls.  If speculation about future replacement of such items suffices to establish the interstate commerce nexus, the Hobbs Act would embrace virtually all local robberies.  Similarly, the happenstance that a tourist purchases locally produced merchandise does not transform that purchase into an interstate transaction.  Otherwise, the robbery of a fruit peddler's stand that is patronized by tourists becomes a Hobbs Act violation.  On the record before us, the majority's conclusion that the jury could find a nexus between the defendants' robbery and interstate commerce is an exercise in imagination that places this case beyond the outer boundaries of our prior precedent.  I cannot agree to such an expansion of the law.